SCANNED AT LoCI and E-Mailed
to USDC on _____ 20 _25_ by _____

No. of Pgs. _111_

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

Western Division

|  |  |
|---|---|
| Curtis Anthony Wood | Case No. **3:25 cv 289** |
| *Plaintiff(s)* | *(to be filled in by the Clerk's Office)* |
| (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | **THOMAS M. ROSE** |
| -v- | **MAGISTRATE JUDGE VASCURA** |
| Joshua Blankely, et al |  |
| *Defendant(s)* |  |
| (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.) |  |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
(Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name                                          Curtis Anthony Moody

All other names by which
you have been known:                          X

ID Number                                     720836

Current Institution                           London Correctional Inst.

Address                                       P.O. Box 69
                                              London            Ohio      43140
                                              _____         _____   _____
                                              City              State     Zip Code

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. Make sure that the defendant(s) listed below are identical to those contained in the above caption. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

Name                          Joshua Blankely
Job or Title (if known)       Montgomery County Dayton Police officer
Shield Number                 29698    Axon body 4 DOIA262626
Employer                      "City of Dayton"
Address                        371 W. Second St.
                               Dayton            Ohio      45402
                               _____         _____   _____
                               City              State     Zip Code

[X] Individual capacity    [X] Official capacity

Defendant No. 2

Name                          John Doe
Job or Title (if known)       Montgomery County Dayton Police officer
Shield Number                "Unknown"  Axon body 4 DOIA2799W
Employer                     "City of Dayton"
Address                       371 W. Second St.
                              Dayton            Ohio      45402
                              _____         _____   _____
                              City              State     Zip Code

[X] Individual capacity    [X] Official capacity

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

Defendant No. 3

    Name

    Job or Title *(if known)*

    Shield Number

    Employer

    Address

| *City* | *State* | *Zip Code* |
|---|---|---|

☐ Individual capacity    ☐ Official capacity

Defendant No. 4

    Name

    Job or Title *(if known)*

    Shield Number

    Employer

    Address

| *City* | *State* | *Zip Code* |
|---|---|---|

☐ Individual capacity    ☐ Official capacity

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

    ☐ Federal officials (a *Bivens* claim)

    ☒ State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

C.     What date and approximate time did the events giving rise to your claim(s) occur?

D.     What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*



## V.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.



## VI.   Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

**VII. Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures. Your case may be dismissed if you have not exhausted your administrative remedies.

A.    Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☐ Yes

☐ No

*N/A*

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

B.    Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☐ Yes

☐ No

☐ Do not know

*N/A*

C.    Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☐ Yes

☐ No

☐ Do not know

*N/A*

If yes, which claim(s)?

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

D.  Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☐ Yes

☐ No

*N/A*

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☐ No

*N/A*

E.  If you did file a grievance:

1.  Where did you file the grievance?

*N/A*

2.  What did you claim in your grievance?

*N/A*

3.  What was the result, if any?

*N/A*

4.  What steps, if any, did you take to appeal that decision? Is the grievance process completed? If not, explain why not. *(Describe all efforts to appeal to the highest level of the grievance process.)*

*N/A*

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

A.     Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☐ No

B.     If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

   1.   Parties to the previous lawsuit

        Plaintiff(s) _____

        Defendant(s) _____

   2.   Court *(if federal court, name the district; if state court, name the county and State)*

        _____

   3.   Docket or index number

        _____

   4.   Name of Judge assigned to your case

        _____

   5.   Approximate date of filing lawsuit

        _____

   6.   Is the case still pending?

        ☐ Yes

        ☐ No

        If no, give the approximate date of disposition. _____

   7.   What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

        _____

C.     Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

## IX.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:

Signature of Plaintiff

Printed Name of Plaintiff

Prison Identification #

Prison Address

| City | State | Zip Code |
|------|-------|----------|

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

| City | State | Zip Code |
|------|-------|----------|

Telephone Number

E-mail Address

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

Curtis Moody,                                :
        Plaintiff,
-V-
                                             Case No.: 3 : 25 cv 289

CITY OF DAYTON                               :      Judge: THOMAS M. ROSE
Individual and Official capacity,
                                                    Magistrate:
Joshua Blankley, Police Officer
Individual and Official capacity,            :      MAGISTRATE JUDGE VASCURA

 John Doe, Police officer
Individual and Official capacity,

                                             :      **EVIDENTIARY HEARING**

                                                    **REQUESTED**

        Defendants.                          :      **JURY DEMANDED**

---

## 42 USC § 1983 CIVIL RIGHTS COMPLAINT

---

**NOW COMES** Curtis Moody, *pro se* and in good faith, pursuant to § 42 USC 1983 to address the "effects of actions of government officials for the deprivation of the decedents life without due process of law, and for punitive damages of minor child Brian Moody" in Dayton, Ohio on the 500 block of Negley avenue.  I am seeking punitive and compensatory redress in the amount of $3,000,000.00 for violation of my natural, constitutional and statutory rights in retaliation.

## JURISDICTION AND VENUE

1 | Page

1. The District Court has original jurisdiction pursuant to 28 U.S.C.§1331 28 U.S.C. §1343(A)(3) Ohio Rev. Code § 2125.02 and 42 U.S.C § 1983.Ohio Rev.Code Ann. § 2305.21

2. Venue is proper as the Defendant-offenders are public officials employed by City of Dayton. All acts complained of occurred within the Southern District of Ohio, Western division.

3. Plaintiff's cause of action arose in Dayton, Ohio on the 500 Block of Negley Avenue

## PARTIES

4. Plaintiff, I Curtis Moody, am the biological father and **"Personal Representative"** of the (deceased) Brian Moody, I am whom is filling the complaint in this court for the constitutional violations of the City of Dayton police officer's namely, mention above.

5. Those officers are responsible for Moody's death by the use of excessive force in violation of the Fourth Amendment against the officer's via 42 U.S.C. §1983.

6. At all times material to this complaint, all defendant-offenders are natural persons, police officer's employees, public officials, acting under the color of state law and outside the scope of their employment.

7. All defendant-offenders are being sued in their individual and official capacities.

## STATEMENT OF THE CASE AND FACTS

8. Plaintiff incorporates paragraphs 1-6 as if fully set forth herein.

9. On 6/29/2024 at approximately 8:00pm that evening two Dayton police officers namely, Joshua Blankley and John Doe was patrolling a residential area where they received a report of a block party /gathering on the 500 block of Negley Ave. in Dayton, Ohio.45417.

10. Upon arrival, cruiser camera and body camera footage clearly reveals innocent civilian people gathering congregating and "minding their business." no criminal activity what so ever.

20. In fact, he never turned around at all he looked over his left shoulder and a "melee" of gun fire erupted from both officers' the final fatal shot hit Moody in the back killing him. See Body camera and Cruiser camera footage "withheld" by "Dayton Police Department"

21. A police officer may not seize an unarmed, non-dangerous suspect by shooting him dead

*Tennessee v. Garner .471U.S.1, 11. 105 S. Ct. 1694.85L.Ed.2d 1 (1985).*

22. The evidence will clearly show bad faith in wanton intent to use excessive force by officer Blankley, premeditation and pure intentional mind state to shoot Moody upon his arrival his verbal command to a visually un-armed, non-dangerous, individual was

**"If you run." You're going to get shot."** Which is disturbing and unprofessional.

23. The use of excessive force was objectively unreasonable from the start to finish this seizure was reckless and without probable cause and before police may arrest a citizen, the Fourth Amendment requires that police have probable cause to believe criminal activity is at hand. *Dunaway v. New York ,442 U.S. 200, 212-12, 99 S.Ct.2248 60 L.Ed.2d 824(1979)*. If police officers nonetheless arrest a citizen where probable cause is so absent that the officer sheds his or her qualified immunity, the officer may be held accountable under Section §1983 for the wrongful arrest. *Gardenhire v. Schubert, 205 F.3d 303.315(6th Cir.2000)*.

24. Visually never seeing Moody with a firearm in his possession during initially stopping him and he neither pointing or brandishing a weapon, nor made any aggressive threats or movements the use of deadly force is "objectively unreasonable" and officer's had no probable cause to believe he would pose a threat of serious physical harm, either to officer's or to others. Running away from the threat of being shot by police "visually unarmed."

4 | Page

25. Body and cruiser camera footage tells a different version of events police officers made statements that Moody, during the foot pursuit suddenly retrieve a gun in mid-stride from his pocket or waistband this information is totally inaccurate and totally fabricated.

26. Chief of police during a Dayton daily news press conference show a partial video of Axon body 4 camera footage and Moody can be seen running away from officer visually unarmed after that, footage cuts to 53 seconds after the shooting were apparently, a blared image of Moody can be seen shot and laying on the ground.

27. Officers appeared to be pulling something from underneath Moody, or conducting a search before they turned Moody on his back from laying on his stomach and mysteriously several feet in a bushed area they recovered a weapon which is conspiracy.

28. Following this, initial incident in a disparate attempt to conceal their wrongdoing officers allege their actions are justified but this falsehood accordingly was to absolve them of responsibility to justify shooting Moody in his back killing him.

29. More importantly, [officer's] murdered an unarmed innocent 16-year-old boy and lied about the facts saying he pointed a gun in their direction theses assassins targeted this teen killed him in cold blood in front of several civilians whom heard them threating to shot Moody, and close review of the body and cruiser camera footage DPD is with-holding and refusing to release will show the unconstitutional Fourth Amendment violations of excessive force.

30. Officers Blankley and Doe were deliberately indifferent to Moody's serious medical needs obviously, after shooting him common sense would come to mind this individual needs medical aid but instead, officers began searching Moody and began crowd control because the events that taken place was unconstitutional and Moody never pointed a weapon.

31. Moody, laid suffering and a conscious pain and suffering for several minutes before an on scene nurse made the decision to render aid Moody, was bleeding out and died from his injuries and this unconstitutional fourth amendment violations is the product of failure to train and or/ supervise by the chief of police and city of Dayton, Ohio.

## CLAIMS OF CONSTITUTIONAL VIOLATION

Plaintiff incorporates paragraphs 1-31 As if fully set forth herein

### CLAIM I: EXCESSIVE USE OF DEALY FORCE IN VIOLATION OF 42U.S.C.§1983:

The case at bar, (DPD) use of excessive deadly force was unreasonable and a violation of the Moody Fourth Amendment Constitutional rights. The unreasonable seizure by use of deadly force by law enforcement which violated Moody's rights under the Fourth Amendment of the United States Constitution to be free from excessive deadly force.

Here, the plaintiff sole argument is that officer's Blankley and Doe lacked reasonable suspicious or probable cause to stop Moody 16-years-old and these officer's conduct violated his rights under the United States Constitution Fourth Amendment to be free from excessive force when he was fatally shot by those officers.

The Fourth Amendment's ban on unreasonable seizures prohibits the use of excessive force during an arrest or investigatory stop. Graham v. Connor, 490 U.S.386,389,104 L.Ed.2d. 443, 109 S.Ct.1865(1985). In determining whether a police officer's use of force was "reasonable" under the circumstances, the inquiry is whether the officer's actions are objectively reasonable in light of facts and circumstances confronting them, without regard to their underlying intent or motivation.Id.at 39.

Under Graham and Garner, law enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed. See Harris v. Roderick ,126 F.3d 1189, 1204 (9th Cir.1997); Bennett ex rel. Estate of Bennett v. Murphy ,120

Fed.Appx.914.918(3ʳᵈ Cir.2005). In Curnow by and through. Curnow v. Ridgecrest Police 952F.2d 321,325(9ᵗʰ Cir. 1991). The Court held that police officers were not entitled to qualified immunity from Section 1983 liability for fatally shooting an armed suspect because the victim did not point the gun at officers and apparently was not facing them when they shot him the first time.

The critical issue is whether the suspect poses a perceived threat of serious physical harm to the officers or others. See Sample v. Bailey ,409 F.3d 689.699(6ᵗʰ Cir. 2005) Many factors such as the time of day, proximity to others, and whether the suspect is fleeing, armed, intoxicated, or mentally unbalanced. may bear upon this question but cannot.in and of themselves justify, officers Joshua Blankley and John Doe decision to shoot him See Id. Thus, the mere fact that Moody was possibly armed and or mentally unstable cannot automatically warrant the use of deadly force.

## CLAIM II: PAIN AND SUFFERING FORM DEPRIVATION OF LIFE 42U.S.C.§1983:

In the case at bar, it should be noted that Moody, the (deceased) survived his injuries for a discernible period of time before his demise and experienced during that period of time survival conscious pain and suffering.

Accordingly, it was a conscious pain and suffering experienced by Moody, during interval between the actual injury caused by police shooting him in his back and the ultimate death and it should be very clear that Moody, suffered conscious pain and emotional distress while laying shot in his back bleeding out and officer Blankley, should be held accountable for his outrageous character which was extreme in degree ,as to go beyond all possible bounds of decency ,and to be regarded as atrocious and utterly intolerable in a civilized community.

## CLAIM III: A MONELL CLAIM AGAINSTV THE CITY OF DAYTON FOR FAILURE TO TRAIN AND INVESTIGATE 42U.S.C.§1983:

7 | Page

It is now well established that a municipality may be held liable under§1983 but only for its acts Monel v. Dept. Of Social Serv. 436 U.S. 658,690-91 .89S.Ct. 2018,56L.Ed. 2d611 (1978). A Municipality acts through custom and policy. Id.at 694; City of Canton v. Harris ,489U.S.378, 385 109S.Ct. 1197 103          L.Ed.2d 412(1989). Custom or policy can take the form of (1) official policy or legislative enactments, (2) decisions or ratifications of final decision makers, (3) inadequate training or supervision or (4) a custom of acquiescence to or tolerance of rights deprivations. Jackson v. City of Cleveland, 925 F.3d 793, 828 (6th Cir.2019). Moody must establish the existence of a municipal custom or policy, a constitutional violation (addressed above) and, a cased link between Two City of Canton 489U.S.at 385

**DAYTON POLICE DEPARTMENT GENERAL ORDER "USE OF FORCE" 3.03-2 REV 05/25 KAMRAN AFZAL –DIRECTOR AND CHIEF OF POLICE    Policy Statement**

Cites the Controlling Law of Graham v. Connor .490 U.S.386, See page 1 paragraph three

This use of force policy has failed to articulate thoroughly that the use of force deadly or not is a Fourth Amendment Constitutional rights violation and "The City" can be held liable for inadequate training or failing to supervise which is so vitally important because police have essential duties to serve and protect and follow policy and the United States Constitution.

Excessive and unjustified force is commonly tolerated by the City of Dayton. It has become repetitive, routine, and the city commissioners and mayor have received several complaints from the community in regards to Use of Force.

to recite the actual ratio would speak volumes of the failure to properly train and / or supervise the field officer's. the unjustified and unreasonable evolving uses of force, indicates a pattern of escalation in the statistics as seen, 2023 47% to 2024 188%, to wit, this year, 2025, is on track to exceed the previous two years.

8 | P a g e

Moody, now aware and observant stopped tuned towards officer's and Blankley, verbally threaten "if you run." "you're going to get shot."

1. Moody was visually unarmed during this entire encounter.

2. Moody was running way not towards the officer's or the public.

3. Moody never threaten officer's or anyone else.

4. Moody never brandish a firearm nor gestured, or reached for his waistband.[1]

Under Graham and Garner, law enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed. See Harris v. Roderick ,126 F.3d 1189, 1204 (9th Cir.1997); Bennett ex rel. Estate of Bennett v. Murphy ,120 Fed.Appx.914.918(3rd Cir.2005). In Curnow by and through. Curnow v. Ridgecrest Police 952F.2d 321,325(9th Cir. 1991). The Court held that police officers were not entitled to qualified immunity from Section 1983 liability for fatally shooting an armed suspect because the victim did not point the gun at officers and apparently was not facing them when they shot him the first time.

As one can see of the evidence of its face, Mr. Moody was running away from the officers, was not brandishing any weapon, and poised no physical or immediate threat to any, let alone the officers. This is how and why the definition of excessive use of force comes into play pursuant to the City Commissions convened to establish the definition of and the excessive use of "FORCE".

The City of Dayton, Commissioner, Mayor and the Dayton Police Department have all agreed on a working order for the use of force to be followed by **all** officers of the Dayton Police department.

Not only does this give a working definition of the Use of Force, but its application in the field to be adhered to under any and all circumstances. See A, 1-3.

Out of the abundance of caution, please allow articulation as to how the inadequate training and lack of supervisor can lead to liability of the City of Dayton.

---

[1] Kamran Afzal --Director and Chief of police 3.03-2 page 11of 15

H. Use of Force Prohibitions

1. officers may not use or threaten to use force for the following reason:

- To prevent person from resisting of fleeing in the future

-Against person who are handcuffed, and /or restrained and complaint where their actions present no substantial risk of escape, injury, and /or property damage.

Officer's appear to be inadequately trained and /or supervised because the results of the interactions with 16-year-old Brian Moody the City of Dayton has been on notice since 2020 til 2025 that the use of force has been an ongoing issue with the police department and the city appears to have accosted the police department for their actions.

Officer Blankley and Doe was inadequately trained in the use of force, and deadly force, the use of Body camera operations, and Taser use which is obvious from disciplinary actions and these typical forms of misconduct indicates how Dayton Ohio, Montgomery County police officers continuously use deadly unconstitutional force.

The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of Moody in which those officers came into contact.

This inadequate training and lack of supervisor and the failure of the City of Dayton to make sure their police officers received proper training to protect and serve the public is the "moving force" behind the unconstitutional violations in which in order to establish the liability of a government body under 42U.S.C.S. §1983.

Just because the city of Dayton and commissioners decide to a pleased the public by presenting a policy change but fails to make sure thus changes are finalized to protect the public and make sure their officers no only protect and serve but follow and understand the constitution guarantees for the public and understand what laws are broken and whom is liable for unconstitutional breach of policy.

Plaintiff has adequately alleged that an agent of Montgomery County, while acting under color of state law, violated his son Brian Moody's constitutional rights, by deliberate indifference to his serious medical needs after shooting him in the back which this unconstitutional seizure and the pervious policy or custom of the county was the "moving force" behind the alleged constitutional violation. *Monell, 436 U.S. at 694.* Such a policy or custom may consist of: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005).*

Here, the Montgomery County Defendants promulgated certain customs, policies and practices that caused the violation of his constitutional rights. See 2024 use of force policy resulted in the deprivation of his constitutional rights. More importantly, since 2020 until 2025 the city of Dayton has been aware and identified that changes and action should be taken to

## CLAIM V: THE INTENTIONAL INFLICTION OF EMTIONAL DISTRESS
### CONDUCT WAS OUTRAGEOUS  42U.S.C.§1983

To prevail on a claim of Outrage, or intentional infliction of emotional distress, the plaintiff must show (1) extreme and outrageous conduct;(2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff if emotional distress.

In this case, DPD officers Joshua Blankley, specifically, his conduct was outrageous and intentional and it is apparently obvious emotional distress and mental anguish would be an issue because Blankley acted with intent to cause reckless disregard of the probability of causing Moody, and Moody's family emotional distress.

(1) To verbally threaten Moody, for no apparent reason "if you run. "You're going to get shot" is extreme and outrageous conduct by thus officer and with the intentions of causing, or reckless disregard of the probability of causing, emotional distress.

(2) Moody definitely "suffer[ed] severe or extreme emotional distress because why would he be threatening to be shot for walking down the street minding his business.

(3) Then this officer actually shooting and killing Moody while visually unarmed and without probable cause and actual and proximate causation of the emotional distress by engaging in outrageous conduct.

### CLAIM VII: FAILURE TO INTERVENE  42U.S.C.§1983

Dayton Police officer "John Doe" violated § 1983 by failing to intervene and prevent Moody, death. An officer "who" is present and fails to intervene to prevent other law enforcement officers form infringing the Constitutional rights of citizens is liable under § 1983

If that officer had a reason to know (1) that excessive force was being used, (2) that a citizen was being unjustifiably arrested, or (3) that any Constitutional violation has been

14 | Page

kills Moody and doe and Blankley, never attempted to attend to [Brian Moody's] emergency needs as he lay dying bleeding on the ground.

More importantly, Doe, could have prevented Moody's death by deploying his Taser he could have intervene by accosting his fellow officer obviously observing Moody unarmed which would be unreasonable to use deadly force but Doe, actively participates firing his service weapon at Moody while he was down.

## CLAIM VII: ASSAULT AND BATTERY  42U.S.C.§1983

The elements of a cause of action for assault are (1) defendant acted with intent to cause harmful or offensive contact ,or threaten to touch plaintiff in a harmful or offensive manner;(2) Plaintiff reasonably believed she or he was about to be touched in a harmful or offensive manner and reasonably appeared to plaintiff that defendant was about to carry out threat; (3) plaintiff did not  consent to defendant conduct ;(4) plaintiff was harmed ;and (5) defendants conduct was a substantial factor in causing plaintiff harm.

In the case at bar, Dayton police officer Joshua Blankley, (1) this officer's actions was intentional and he attended to cause physical harm which was obviously apparent because he carried out his threat of shooting Moody if he ran (2) Moody had reason to believe the police officer would harm him because this officer said verbally he would.(3) Moody did not consent to being assaulted by police.(4) Moody was harmed and died as a result of his injuries from police .(5)  Dayton police officer Joshua Blankley, conduct was a the substantial factor in causing Moody's harm and this officers outrageous character was extreme in degree ,as to go beyond all possible bounds of decency ,and to be regarded as atrocious and utterly intolerable in a civilized community.

## CLAIM VIII: LOSS OF PARENTAL CONSORTIUM 42U.S.C.§1983

A parent has a right to maintain a loss of consortium action against a third –party tortfeasor who negligently injurie the parent's minor child "consortium" can include a loss of society, companianship, comfort, love, and solace between parent child.

Regardless of who suffers the physical injury (parent or child) the other member of the parent –child relationship may suffer loss of the consortium of the injured victim.as a result. a minor child also has a cause of action for loss of parental consortium to recover for a loss of society companionship, affection, comfort, guidance, and counsel.

## CLAIM IX: OHIO WRONGFUL DEATH ACT, Ohio Rev. Code Ann.§2125.02 (B)(3)(b)

Wrongful death statues permit survivors to sue when a killing violated their decedents rights. The court has held that. §2125.02 (B)(3)(b). provides for the persons permitted as plaintiff to claim loss of consortium as a compensable loss under wrongful death statue.

Provides that a wrongful death award may include loss of the society of the decedent including loss of companionship. Consortium, care, assistance, instruction, training, and education suffered by the surviving spouse, minor children, parents, or next of kin.

In the case at bar, there is ample evidence that the decedent experienced conscious pain and suffering prior to his death and officer's Blankley and Does, acts were with "malicious purpose" in bad faith, or in a wanton or reckless manner.

The standard for recklessness employed by Ohio courts holds that the actor's conduct is in reckless disregard of safety of others if such risk is substantially greater than that which is necessary to make its conduct negligent. The Ohio Supreme Court has defined reckless conduct as conduct "characterized by the conscious disregard of or indifference to a known or obvious

17 | Page

risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct (Restat 2d of Torts, §500)

1. Loss of support from the reasonably expected earning capacity of the decedent

2. Loss of service of the decedent.

3. Loss of the society of the decedent including of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent,

4. Loss of prospective inheritance of the decedent 's heirs of law at the time of the decedents death.

5. The mental anguish incurred by the surviving spouse, dependent children, parents, or next of kin of decedent,

## CLAIM X OHIO SURVIVAL ACTION OHIO REV. CODE §2305.21

A decedent's personal representative in a survival action, may recover damages for the decedents pain and suffering upon a showing that the decedent was **"conscious"** of his pain and suffering prior to death. See Flory v. New York Central rd. Co. 170 Ohio St. 185,189,163N.E.2d 902,905(1959). See also Jones ,534F.2d at 1213.

Physical or bodily pain and suffering in consequence of a wrong occasioning an injury to the person is a proper element of damages. But allowance can be made only for pain and suffering of which the injured person is conscious, and damages for pain during the time that the injured person is unconscious are not allowable. Since one cannot experience pain and suffering while unconscious no recovery can be had for pain and suffering endured by one fatally injured

by the negligence of another of the person is rendered unconscious at the instant of the injury and dies of such injuries without ever having regained consciousness.

In the case at hand, it should be noted that Moody, survived his injuries for a discernible period of time before his demise and experienced during that period of time survival, conscious pain and suffering experienced by the decedent during interval between injury and ultimate death. This was evident pursuant to the off duty nurse who at the scene administered care to the decedent at the time of the shooting, and until his death. This will be evident in the discovery phase of this action, and/or during the evidentiary hearing. As was asked for in the title of this action, it will be necessary for this Court to discern all evidence to seek the truth of this matter. In doing so, it will be proven the suffering that Mr. moody suffered at the hands of the officers, and the sheer neglect of their depraved indifference.

This Plaintiff asked pursuant to U. S. C. S. Fed Rules Civ Proc. 34, for the police to produce the investigative reports and witness statements of the off duty nurse who administered care to Mr. moody at the scene. It is material and germane to the case at bar, as it will give first-hand testimony to the pain and suffering experienced by Mr. Moody in his dying moments. Also pursuant to U. S. C. S. Fed Rules Civ. Proc. 26, motion for discovery also shall be satisfied, to wit, will provide additional witness statements that coo borate the assertions made here.

**CONCLUSION**

This case is extraordinary and special and needs the "clear eyes" of the judicial machinery and its functions to render justice and up hold the law of United States Constitution and hold these officers' accountable for the actions of murdering an innocent sixteen-year-old

juvenile [Brian Moody], in which was just walking down the street "minding his business" like everyone else was that evening when police arrived.

This evening police received a report that people were congregating near an abandon property on a residential street and when police arrived and failed to check the logistics of the call they immediately targeted Moody, which still remains a conspiracy as to why they would like to speak to this juvenile without parental consent and why they would feel authorized conducting an investigatory stop without probable cause is unclear and a breach of policy.

More importantly, I am "appalled" by these officer's conduct and there is no possible justification as to this action which was reckless, in bad faith in wanton manor and this injustice is clearly, unjustified, unconstitutional, and objectively unreasonable for the use of excessive deadly force by those DPD, Officer's after threating to shoot a visually unarmed man then acting out the threat as if premediated intentions were apparent and completely fabricating reports to superior chief of police saying this teenager pointed a weapon was "a lie is in fact a lie no matter its substance".

In contradiction, of the statements made the evening in question the body camera and cruiser camera video footage which is alter seemingly tells a different version of the story based on the logistics it is impossible that Dayton Police officer's namely Joshua Blankley Axon body 4 DO1A226W & John Doe Axon body DO1A2299V could have reason to believe that this unarmed non-dangerous ,non-suspect was a threat to thus, officers, or the community visibly running away from the same individual whom gave a verbal direct order to Moody, whom was facing away from him order him. *"if you run". "You're going to get shot"*

Moody, scared for his life from the threat from police officer's active resisted but even if commands were given, mere noncompliance with an officer's command does not constitute

active resistance. *Eldridge v. Warren*, 533 F. App'x. 529, 535 (6th Cir. 2013) ("[N]oncompliance alone does not indicate active resistance; there must be something more."). officers made statements that while Moody was running away he turned and reached and /or pointed a weapon these events are inaccurate this teenager never brandished nor gesture he possessed a weapon.

Mere possession of a weapon without more is insufficient to justify deadly force Although it is not necessary that a gun be pointed at another person for deadly force to be justified there must be some indication that the possessor of a weapon is willing to and is about to use the weapon to harm officer's. Here, Moody was shot and killed "without any reliable justification" for using excessive force in violation of the Fourth Amendment to the United States Constitution this incident was unreasonable, unjustified, and unconstitutional and again objectively unreasonable.

More importantly, this was not a crime scene where officer's received a call that violence or a crime had been committed and had a detailed description of an assailant. The totality of the circumstances did not permit the unconstitutional use of deadly force, and no reasonable officer could have believed otherwise and the United States Court of Appeals for the Sixth Circuit has held that it has been clearly established in the Circuit for the past 20 years that a criminal suspect has a right not to be shot unless he is perceived to pose a threat to the pursuing officers or to others during flight. This articulation of the Garner rule is clearly established even in situations with diverse factual distinctions.

Even if Moody was carrying a concealed weapon mere speculation is a "Hunch" and not facts that would give probable cause to warrant the use of force where there is not a crime being committed so the severity of crime is not an issue that would justify suspicious and officers could not have possibly known for sure this teenager was armed visually accosting him from behind.

Officer's would have been better off justification wise to give a verbal command to Moody, we have reason to believe you are armed stop and put your hands where we could see them or simply ordering him down on the ground now but officers could already upon arrival visually see Moody, was unarmed and posed no immediate threat to police or the community.

As discussed above, the video does not show any definitive movement of Moody's hand prior to him being shot in the back. Watching the video in real time, it appears that Moody, was simply holding pants from falling while he ran and was shot in the back.

Therefore, a reasonable jury viewing the video could resolve the dispute in favor of Moody that those officer's actions were objectively unreasonable. *See Bouggess*, 482 F.3d at 896 ("[E]ven when a suspect has a weapon, but the officer has no reasonable belief that the suspect poses a danger of serious physical harm to him or others, deadly force is *not* justified."); *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017) ("[W]e do not hold that an officer may shoot a suspect merely because he has a gun in his hand."). Although it is not necessary that a gun be pointed at another person for deadly force to be justified, there must be some indication that the possessor of a weapon is willing to and is about to use the weapon to harm officers or others.

*See Bouggess*, 482 F.3d at 896; *Bletz v. Gribble*, 641 F.3d 743, 753-54 (6th Cir. 2011) (unreasonable to shoot when suspect had a gun in his hands but "there was no imputation of past or potential future violence on the part of [the suspect]" and the suspect was complying with police commands); *Brandenburg v. Cureton*, 882 F.2d 211, 213, 215 (6th Cir. 1989) (unreasonable to shoot a suspect who previously threatened violence to officers but was not pointing his gun at the_ officer or others).

# Action Item 2: Review of Use of Force

Goal:

Assess all recent incidents in which force was used by Dayton police to look for patterns of biases, which will inform a review of use of force policies.

Current Status:

The Department takes an active role in looking for indicators of individual officer misconduct. The Dayton Police Department investigates all pertinent administrative encounters as well as complaints. Supervisors submit the results of their investigations through the chain of command and all are given final review by the Professional Standards Bureau. In addition, in 2018 a joint effort between the Human Relations Council, Community Police Committee, and the Dayton Police Department produced a report revealing the results of their study into the Department's relationship with the community.

| Current Procedure | Results |
| --- | --- |
| • **Administrative Investigation Records Management System** | A database is maintained for all administrative investigations including Uses of Force, Citizen Complaints, Traffic Crashes, etc. |
| • **Early Identification/Intervention** | CALEA-Compliant tracking system which features Peer Group Analysis and customizable thresholds |
| • **Statistical Analysis** | The department utilizes a range of statistical reports and charts i.e. aggregate, trends, and comparative formats |
| • **Community Police Council Statistical Review** | Community Police Council did an extensive review of use-of-force incidents, which is detailed in the report (available at daytonohio.gov/policereform) |
| • **The Professional Standards Bureau** | PSB is in the process of reviewing all Use of Force Data and developing updated demographic reports |
| • **Transparency Dashboard** | The City of Dayton Data Team is researching the option to include historical police use of force data in a dashboard environment which would allow any community member easy access to Dayton Police Use of Force data. |

# USE OF FORCE

## GOAL

Assess all recent incidents in which force was used by Dayton police to look for patterns of biases, which will inform a review of use of force policies.

## WORKING GROUP MATERIALS

### CURRENT STATUS

The Use of Force working group had their last meeting on April 1, 2021, and made a total of 21 recommendations. Memos of those recommendations and responses from the Commission are below as well as infographics of some of the Use of Force Committee's recommendations.

| # | Memo to Commission | Response from Commission |
|---|---|---|
| 1 | Memo | Response |
| 2 | Memo | Response |
| 3 | Memo | Response |
| 4 | Memo | Response |
| 5 | Memo | Response |

Select Language  ⌄

Go gle Translate

CHAT

| # | Memo to Commission | Response from Commission |
|---|---|---|
| 6 | <u>Memo</u> | - |
| 7 | <u>Memo</u> | <u>Response</u> |
| 8 | <u>Memo</u> | <u>Response</u> |

Click each image below to view the full version.

  



MEETING MATERIALS

CHAT

<u>Translate</u>

| Meeting Date | Agenda | Minutes | Additional Resources |
|---|---|---|---|
| February 11, 2021 | - | Minutes | - |
| October 29, 2020 | - | Minutes | - |
| October 15, 2020 | - | Minutes | - |
| September 3, 2020 | - | Minutes | - |
| August 20, 2020 | - | Minutes | - |
| August 6, 2020 | - | Minutes | - |

## OTHER MATERIALS

- [Video] Lt. Sheldon - Use of Force

# PREVIOUS PROCESS

The Department takes an active role in looking for indicators of individual officer misconduct. The Dayton Police Department investigates all pertinent administrative encounters as well as complaints. Supervisors submit the results of their investigations through the chain of command and all are given final review by the Professional Standards Bureau. In addition, in 2018 a joint effort between the Human Relations Council, Community Police Committee, and the Dayton Police Department produced a report revealing the results of their study into the Department's relationship with the community.

| Current Procedure | Results |
|---|---|
| **Administrative Investigation Records Management System** | A database is maintained for all administrative investigations including Uses of Force, Citizen Complaints, Traffic Crashes, etc. |
| **Early Identification/Intervention** | CALEA-Compliant tracking system which features Peer Group Analysis and customizable thresholds |
| **Statistical Analysis** | The department utilizes a range of statistical reports and charts i.e. aggregate, trends, and comparative formats |
| **Community Police Council Statistical Review** | Community Police Council did an extensive review of use-of-force incidents, which is detailed in the report (available at daytonohio.gov/policereform) |
| **The Professional Standards Bureau** | PSB is in the process of reviewing all Use of Force Data and developing updated demographic reports |
| **Transparency Dashboard** | The City of Dayton Data Team is researching the option to include historical police use of force data in a dashboard environment which |

CHAT

Translate

**Current Procedure**

**Results**

would allow any community member easy access to Dayton Police Use of Force data.

## CONTACT US

101 W 3rd Street
Dayton, Ohio
45402

Phone: 937-333-3333

Public Works: 937-333-4800

Waste Collection: 937-333-4800

Email Us

## HELPFUL LINKS

Budget/Finance Updates

Employment Opportunities

Public Meetings and Boards (PDF)

Public Records Requests

## USING THIS SITE

Site Map

Accessibility

Copyright Notices

Legal Notices

Privacy Policy

CHAT

Translate

**Use of Force Reform Working Group**

**Meeting Minutes: February 11, 2021**

**Members in Attendance: (Please List)**

1. Call to order                                                   Commissioner Mims
   a. 5:30- 5:32
2. Use of Force Policy Update                            Barbara Doseck
   a. 5:33- 5:39
3. May 30, 2020 – After Action Report               Barbara Doseck
   a. 5:40- 6:20
      i. Barbara Doseck reviews the After-Action Report of the incidents that occurred during the protest Downtown of May 30, 2020.
   b. 6:20-6:45
      i. Present members of the group ask questions regarding the After- Action Report.
   c. 6:46-7:19
      i. Use of Force Policy Expert update: Law Department is still seeking an outside expert to review the proposed Use of Force Policies.
   d. 7:20-7:30
      i. Members decide to review both proposed Use of Force Policies for the next meeting.
4. Adjourn                                                        Willis
   Blackshear

**Use of Force Reform Working Group**
**Meeting Minutes: October 29, 2020**
**Members in Attendance: (Please List)**

Member task before this meeting*: Review 2017-2019 Use of Force Report Data and Pointing a Gun as Use of Force Research. WG members were also asked to complete a survey to better understand suggested recommendations.

1. Call to Order                                                                                    Comm. Mimms
    a. 5:33-5:40
        i. Commissioner Mimms remarked upon the importance and impact of this WG and addressed the body camera recommendation.
        ii. Invited Questions from the WG
        iii. Discussed budgeting concerns in relation to community efforts and body cameras
            1. Lt. Col.Carper provided an update on the search for providers of body cameras and technology.

2. Research Follow-up cont'd                                                        Lt. Col. Carper/UD Law
    a. 5:40-5:48
        i. Pointing a Firearm as "Use of Force": The group was invited to ask questions about last week's presentation
        ii. Lt. Col. Carper presented research from other Departments around Ohio and beyond surrounding documenting non-contact use of force and pointing a gun at some as a documetable use of force. Lt. Col. Carper is looking into how to go about documenting this type of data electronically.
            1. Lt. Carper explained that testing is underway to turn on body cameras automatically whenever a firearm is unholstered.

3. Questions/Comments on Reporting Use of Force                                    Darius Beckham
    a. 5:48-52
        i. No Questions
        ii. Mr. Arch Grieve called a roll call vote concerning the WG's desire to recommend documenting pointing a gun as a use of force
            1. The vote passes unanimously
        iii. Darius Beckham informed the WG that we will be seeing a memo regarding the recommendation and a response will be offered thereafter.

4. Use of Force Survey Debrief                                                            Darius Beckham
    a. 5:53-6:06
        i. Mr. Beckham reminded the group to read the responses before completing the survey and stressed the importance of completing the survey.

1

      ii.    Mr. Smith discussed what the other working groups are doing and the issues they are addressing. Link to recommendations made by other groups: https://www.daytonohio.gov/933/Recommendations

          1.   Training WG: working on creating a de-escalation training model and Bias Trainings

          2.   The Recruitment WG has put out a recommendation for increasing the DPD recruitment budget and creating a recruitment team that includes both law enforcement and people from the community. This WG is also exploring changing the days and timing available for testing and removing other barriers to hiring. This WG is also recommending the cutoff age for recruitment to increase to 40 (from 35). This WG is now researching the promotion process within DPD to inform future recommendations.

          3.   Oversight WG has made recommendations surrounding community education, specifically, processes involving individual complaints. Now the WG is researching the investigation process.

          4.   The Community Engagement WG just put out a recommendation for an alternative response model for certain non-violent issues.

      iii.   Mr. Smith explained the "super group" and its goals to involve members of each WG.

5. Recommendations?                               Comm. Mimms

   a.   6:06-6:56

      i.    Comm. Mimms addressed the de-escalation goals of the Training WG and began discussion about "Know Your Rights" workshops for community engagement. Mr. Domineck provided additional information and commentary regarding how this can best be achieved in the community.

      ii.    Lt. Carper explained how community education has been delivered in the past: DPD and local attorneys/organizations provided co-lead workshops/presentations at venues like Central State with anywhere from 20-50 participants at each of the )approximately five) workshops.

      iii.   Mr. Smith and the WG went into more detail regarding possible recommendations surrounding the complaint process.

      iv.   Ms. Angelina Jackson brought up an opportunity to leverage data compiled by several jurisdictions to create a "model use of force policy." In order to make recommendations to DPD, it may be helpful to see other examples of recommendations. Should the WG analyze this model policy or other policy examples as a way to inform future recommendations. (The Police Use of Force Project; CampaignZero, etc.) https://www.policingproject.org/use-of-force-policy-guidelines

      v.    Mr. Beckham invited the group to provide feedback on the process of completing the WG recommendation survey.

2

vi. Should the group consider recommending a more detailed de-escalation policy and use of force continuum?

vii. The WG expressed interest in recommending the continuance of "Know Your Rights" education programs.

6. Review Action Items, thanks for time, and adjourn        Willis Smith, Jr.
   a. 6::56-6:58
      i. Darius Beckham will circulated some drafted language for a recommendation.
      ii. Please wait for additional information and take time to review materials before completing the survey if you have not already done so.
      iii. Next meeting, let's review each of the survey responses regarding DPD's use of force policy.
      iv. Thanks for everyone's time.

Member Task before the next meeting: See syllabus in Google Folder
   1. WG members who would like to participate in the "supergroup" should contact Mr. Smith or Mr. Beckham.
   2. Voting members must review materials and complete the WG survey.
   3. WG members should review http://useofforceproject.org/#project; https://www.policingproject.org/use-of-force-policy-guidelines; and other WG recommendations: https://www.daytonohio.gov/933/Recommendations
   4. Ms. Jackson will circulate model policy information and other reportable use of force data.
   5. Mr. Domineck will compile and circulate information materials surrounding "know your rights."

**Use of Force Reform Working Group**
**Meeting Minutes**
**October 15, 2020**
**Members in attendance:** Please list

1. 5:36 - 5:39                Comm. Mims
   Call to Order
     Comm. Mims addressed the challenges we are facing in the community and across the nation. We are working toward creating conditions for a respectful and inclusive community with harmonious relationships between citizens and law enforcement.

2. 5:40 - 5:57            Arch Grieve/Will Smith
   Discussion of Working group Member Survey
   a. Arch Grieve addressed survey concerns with the group to ensure we are moving through the process.
   b. Will Smith opened discussion up to the group for questions and commentary about the process and trust that there will be follow through for tangible results. The goal is to effect positive change.
   c. Discussion about impact and longevity of the working group.

3. 5:57 - 6:24         Lauren Devine & Devin Bartlett
   Research Follow-up
   a. Pointing Firearm as "Use of Force: Lauren and Devin presented research and the group discussed how to conduct and aggregate more data.
   b. Brief discussion of the need to research the psychological impact of pointing a weapon at a suspect.
   c. Discussion of reporting each time a weapon is unholstered. It is not intended to make an officer hesitate due to the fear of needing to file a report.
   d. Comments from Matt Carper concerning different reporting methods and recording technology (body cameras) and the need to address related policy considerations.
   e. Timeline for followup with other departments; approximately 2 weeks
   f. Discussion of Survey and use of force data points

4. 6:24 - 7:06             Lt. Eric Sheldon
   Reporting Use of Force Walkthrough- "Blue Team" Platform
   a. Lt. Sheldon provided a hypothetical walkthrough of how an arrest is documented, including how use of force is documented

b. Lt. Sheldon shared screens so that the group could see how use of force is documented in the system. Thorough review of different drop-down menu options and reporting chain of command.

c. Question and Discussion about public awareness regarding use of force complaints and request for information. Matt Carper added to discussion about the online community board and process for complaints and ensuing investigation.

d. Discussion about the "oversight" working group and plan to spread public awareness about and access to the process for complaints.

e. Discussion about the dashboard link and discussion of other groups' recommendations. Further discussion about opportunities for outreach to educate citizens about their rights during a confrontation with law enforcement.

f. Discussion with Matt Carper about policy updates and general feeling within the department about the existence of problems and the need to address these issues. Further discussion about plans and procedures for addressing systemic issues within the Dayton police department.

5. 7:05 - 7:06                                                      Darius Beckham
Next Steps

a. UDSL students to conduct further research on non-contact use of force best-practices and psychological impact.

b. Plan to address the recommendations of other working groups and possible engagement measures to educate the community on citizen rights.

c. Expect Survey request soon.

**\*Member Task before the next meeting:** See syllabus in Google Folder

**Use of Force Reform Working Group**

**Meeting Minutes: Sept 3, 2020**

**Members in Attendance: (Please List)**

Member task before this meeting: Review 2017-2019 Use of Force and Citizen Complaint Data

1. Call to Order                                                                                         WG Chair Mims
   a. 5:36-5:37
2. Potential Voting Items                                                                       WG Chairs
   a. 5:37-5:38
      i. Body Cameras - WG Chair Mims: what is the comfort level with voting on Body Cameras; Arch Grieve: Addresses voting eligibility, confirmed by Darius Beckham; no voting issues arose
3. Roll Call Vote                                                                                    Arch Grieve
   a. 5:39-5:41
      i. Arch Grieve: Administered Roll Call vote for Body Cameras recommendation:
         1. 16 votes "yes": 0 votes "no" → Vote is Passed
   b. 5:41-5:52
      i. Annual Use of Force Reports -
         1. WG discusses details of the Annual Use of Force Reports details and the Recommendation process and the City Dashboard data. Matt Carper explains the third-party reporting process and discusses data scope for longer periods of time with Darius Beckham. Suggests annual reporting in tandem with 3-year study. WG weighs the cost of annual study and suggests following national trends. A longer study may be appropriate given the scope of data available to the Community on the Dashboard.
   c. 5:52-6:01
      i. Longer Studies in Tandem with Annual Reports and Community Dashboard
         1. WG considers the Annual Use of Force Reports vote. Dashboard data will be available to the community but this does not have the same weight as a recommendation. WG discusses the differences and relative pros/cons of data reports and conducting studies to draw conclusions upon which the Police Department can take action and make decisions.
4. Roll Call Vote                                                                                    Arch Grieve
   a. 6:01-6:08
      i. Arch Grieve and WG: Summarize the issue up for vote
   b. 6:08-6:10
      i. Arch Grieve: Administered Roll Call vote for Annual Use of Force Reports recommendation:
         1. 16 votes "yes": 0 votes "no" → Vote is Passed

5. Use of Force and Citizen Complaint Data Overview                Lt. Eric Sheldon
   a. 6:11-6:15
      i. Darius Beckham explains the agenda and purpose for the remainder of the meeting
      ii. Arch Grieve and Commissioner Mims remind the WG of the importance of avoiding the use of generalizations during discussion in order for the group to function most effectively and respectfully.
   b. 6:15-
      i. Lt. Eric Sheldon reviews the Use of Force Report with the WG.
         1. 6:21-Darius Beckham expressed concerns about the absence of discharge of firearms on the report and suggests adding it
         2. 6:23- Lt. Sheldon explains the injury portion of the report and the data entry process which allows multiple items to be checked.
         3. 6:23- Morgan Bryant and Lt. Sheldon seek to clarify the differences and overlap between "not visible," "no injury," and "not injured."
         4. 6:25- TG Haire expresses concerns and Lt. Sheldon clarifies that a subject may return to the department to report injuries after the fact.
         5. 6:28- Lt. Carper reads O.R.C regarding the definition of "Obstructing official business." Andrew Sexton offers examples.
         6. 6:30- Andrew Sexton and WG discuss the grounds of "reasonable suspicion" to charge a fleeing subject when the subject is later found to be innocent of the original cause.
         7. 6:32- Marc DeWitt expresses concerns over the tactical advantage factor for dealing with a stop. Lt. Sheldon explains how that typical scenario unfolds. Angelina Jackson directs the WG's attention to the Bias-free Policing Policy 1.00-3 which appears to require that a reason for the stop be given.
         8. 6:36- WG would like data about situations when a subject who reportedly matches the description of a suspect and the identification later turns out to be inaccurate. This may be implicated in the occurrence of "obstruction" or "resisting" when the subject is misidentified.
         9. 6:40- Donald Domineck has concerns about probable cause, bystanders, search and seizure. Andrew Sexton explains the difference between probable cause and reasonable suspicion. Reasonable suspicion is a lower threshold to stop a subject. Bystanders can be charged with obstruction.
         10. 6:45- Rev D would like to examine the policy and practice surrounding pat-downs and searching pockets. Andrew Sexton explains the process for an officer's need to lawfully detain a subject, articulate the reasonable suspicion, and to determine whether the subject is presently armed and dangerous. "Pat downs" are on the surface of the body or

under a thick layer of clothing such as a jacket. However, if contraband is found during a pat down, then a search of pockets is permitted.
   11. 6:51 - TG Haire would like demographic and zoning data surrounding the occurrence of pat-downs and searches. WG discusses possible data reporting metrics for pat downs and searches to illuminate the issue.

6. Review Action Items and Adjourn                                    Darius Beckham
   a. 6::57-7:00
      i. Darius Beckham: reminds the group of WG's charter and to be respectful; We agree we should follow up on the Bias-free Policing policy before next meeting.


Member Task before the next meeting: See syllabus in Google Folder
   1. Commissioner Mims will draft a memo of the WG's recommendations to the Mayor and Fellow Commissioners.
   2. Plan to discuss Bias-free Policing policy 1.00-3 at next meeting

**Use of Force Reform Working Group**

**Meeting Minutes: August 20, 2020**

**Members in Attendance: (Please List)**

Member task before this meeting: Review and provide feedback on (3.03-2) Response to Citizen Resistance / Non-Compliance and Constitutional Use of Force Summary

1. Call to Order                                                          WG Chair Mims
   a. 5:33-5:34
2. Overview of Vision Statement/Goals/Purpose                            WG Chair Blackshear
   a. 5:34- 5:37
      i. Review Mission/Vision/Objectives of the Use of Force working group
3. Overview Syllabus & Google Folder                                     City Staff – Darius
   a. 5:38- 5:40
      i. Darius Beckham- Review of the syllabus and information that is accessable through the google drive folder
4. Policy Review: 3.03-2 Response to Citizen Resistance / Non-Compliance Arch Grieve/Will Sm
   a. 5:41
      i. Donald Domineck- Expressed concerns with illegal searches and seizures. Numerous stops by police officers where there is no probable cause.
      ii. Theresa Haire: Expressed concerns with over policing
      iii. Andrew Sexton: Addresses concerns with Reasonableness standard and when a seizure begins after a citizen is stopped by police.
   b. 5:56
      i. Angelina Jackson: Expressed concerns with officers failing to explain reasons for stopping citizens during an encounter.
   c. 5:59
      i. Corey Cunningham: Concered with Reasonableness standard
      ii. Andrew Sexton: Addresses the difference between case law and DPD policy
   d. 6:04
      i. Matt Carper: address subjectivity within the standard for Use of Force and addresses the layers of accountability within the Dayton Police Department
   e. 6:08
      i. Eric Dudley: Wants to see data addressing the number of stops by police officers on the Westside of Dayton compared to the Eastside of Dayton. Eric Sheldon: able to provide data for the number of stops for a later working group meeting.
      ii. Corey Cunningham: Request to review specific cases concerning the Use of Force and dissect the case as a group to better understand encounters between Police and citizens of Dayton.
   f. 6:19

        i. Marc Dewitt: Concered that Police officers are trained to operate in the gray area of the law

        ii. Howard Jordan: Addressed concerns of how police officers are trained to testify within the police academy. Theresa Haire: Believes officers are trained to testify in court.

  g. 6:30

        i. Jeff Mims: What are the thoughts about Dayton Police Departments having body cameras? Eric Dudley: Body cameras will help but they will not deter. Will Smith: We need to hear testimonies from individuals outside of the group about encounters with Police Officers.

  h. 6:38

        i. Donald Domineck: Are there still policies in place for zero tolerance areas? Jeff Mims: There is no authorization to change those policies.

        ii. Matt Carper: There is no area in the city of Dayton to make a stop without probable cause. Data is used to reduce crime in specific neighborhoods.

  i. 6:47

        i. Eric Sheldon: Body cameras would be beneficial to the Dayton Police Department

  j. 6:51

        i. Matt Carper: Which type of data would the group like to review when focusing on Use of Force? Darius Beckham: How often is Use of Force data analyzed? Matt Carper: Use of Force data is not analyzed regularly

5. Review Action Items and Adjourn                           WG Chair Blackshear

  a. 6:58

        i. Darius Beckham: Email if interested in subcommittee for Use of Force data

**Member Task before the next meeting:** See syllabus in Google Folder

**Use of Force Reform Working Group**

**Meeting Minutes: August 6, 2020**

**Members in Attendance: (Please List)**

Member task before this meeting: Review and provide feedback on Use of Force video

1. Call to Order and Introduction
   a. 3:34-3:40
      i. Introductions of group members not in attendance at last meeting and roll call;
      ii. moment of silence for deceased group member, (NAME);
2. Debrief and follow ups
   a. 3:40-3:42
      i. recap of last meeting: guidelines and logistics, charter, CPC report review, Richard Stock's presentation of 2014-2017 CPC Report (working group requested 2018-2020 report)
      ii. open for outstanding questions
3. Overview of Use of Force Video
   a. 3:42
      i. Review of guidelines and open for discussion
      ii. Donald Dominek: expressed concerns that Written Use of Force Police Guidelines and Processes do not align with real-world experience of police use of force
   b. 3:45
      i. Marc DeWitt: Requests guidance to better understand the focus of group research
   c. 3:46
      i. Howard Jordan: Understanding the presentation and defining use of force
      ii. Commissioner Mims: Expansion from Mr. Dominek regarding anecdotal information that Police Use of Force policies are not actually being followed by Police in the Field;
      iii. Is enough effort being put behind ensuring policies are followed?
   d. 3:51
      i. Angelina Jackson: Reporting Use of Force- what happens after the citizen's appeal board goes to the city Manager? Eric Sheldon: Clarification
      ii. Richard: Are chokeholds taught and practiced by Dayton Police? What tactics are used in practice? Matt Carper: Chokeholds are not used by the Dayton Police Dept. as a manner of force, however, may be employed in an exceptional, life-threatening situation. Officers are taught defensive tactics; making physical arrests while minimizing use of force.
      iii. Understanding that not all national use of force topics (like chokeholds) apply to Dayton. Individual Departments throughout Ohio may vary.

- iv. Destry Fallen: does a use of force report only occur in the case of hospitalization? Lt. Sheldon: response, different reports are triggered depending on the level of force used.
- e. 4:01
  - i. Jeff: What is the protocol from initial engagement for use of force before a report is filed? What transpires in a use of force incident?
  - ii. Pastor Corey Cunningham: Appropriate Use of Force and Noncompliance; TG Haire agrees/expands
- f. 4:10
  - i. Kristin Brand: Discussion of Project Management, vision and goals of the working group
  - ii. Request for Testimonials and discussion about what is actually happening, regardless of policy
  - iii. Discussion of how the group can best function
- g. 4:21
  - i. Commissioner Mims: Interaction between Police and subjects regarding noncompliance.
  - ii. Marc DeWitt: Addressing goals to get on the same page as a group.
- h. 4:31
  - i. VISION discussion/Charter and Scope - What are we trying to achieve in the community?
  - ii. Darius Beckham: Focus remains Use of Force
- i. 4:44
  - i. Review of Landing Page
  - ii. Consensus on what the goals of each meeting will be
  - iii. Sharing of clergy letter for policy reform
  - iv. Request for specific items to discuss at each meeting
4. Review Action Items and Adjourn
   - a. Request for more information like a presentation or list regarding Dayton Police Department's current Tactics for Use of Force - Matt Carper
   - b. Pastor Corey Cunningham: When it is appropriate to use force and how can we break that down? (Noncompliance) TG Haire: How are standards for appropriate use of force applied?
   - c. Andrew Sexton: Presentation on constitutionality of Use of Force
   - d. Testimonials from the community surrounding use of force
   - e. Darius and co-leads to refine meeting goals
   - f. Circulation of relevant policies surrounding use of force

**Member Task before the next meeting:**

Pastor Cunningham to send clergy letter to Darius Beckham

Darius Beckham to draft a "syllabus" for Use of Force Working Group: An overall plan for the use of our time. What is the vision, the goals & objectives, identifying the gaps, why do we have gaps, and then determining the success criteria for this group. Discussion is good...but what are we working to achieve specifically?

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET • P.O. BOX 22 • DAYTON, OHIO 45401
CITY HALL • (937) 333-3636 • www.daytonohio.gov

September 8, 2020

To:     Dayton City Commission

From:   Commissioner Jeffrey J. Mims

Re:     Police Reform Working Group Recommendations

On September 3, 2020 the Use of Force working group voted to put forward the following recommendation to the Dayton City Commission:

1. Body Cameras for the Dayton Police Department
2. Annual Use of Force Report to the Dayton City Commission

Per the working group's charter, the Dayton City Commission has 30 days to respond to the group with one of three options: accept the recommendation, reject the recommendation, or ask the group for further information to be able to evaluate the recommendation.

Accepting this recommendation does not mean that it will be implemented within the 30 day time window. Instead, it means that the City Commission directs the City Manager, Dayton Police Department, or other applicable entity to take action to implement this recommendation as soon as is practicable.

Thank you for your consideration of this recommendation.

Sincerely,

Jeffrey J. Mims, Commissioner

Cc:     Ms. Dickstein
        Mr. Parlette
        Ms. Lofton
        Ms. Doseck
        Ms. Walker
        Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET · P.O BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

October 2, 2020

TO:      Police Reform Working Group- Use of Force

FROM:    Ariel Walker
         Director, Office of the City Commission

RE:      Recommendation on Body Worn Cameras and Annual Use of Force
         Report

On September 3, 2020 the Use of Force Working Group voted to put forward the following recommendations to the Dayton City Commission:

1. Body Cameras for the Dayton Police Department
2. Annual Use of Force Report to the Dayton City Commission

In reference to the implementation of Body Worn Camera for the City of Dayton Police Department, the Dayton City Commission accepts this recommendation and has directed the City Manager to identify funding and a vendor for implementation in 2021.

In reference to the Annual Use of Force Report, The Dayton City Commission agrees that the City Manager, on behalf of the Dayton Police Department will present an annual Use of Force Report to the Commission.

As all five Reform Committees continue their work and make recommendations, the City Commission is committed to providing updates during the due diligence and implementation process.

Thank you for your work on behalf of the City of Dayton.

Sincerely,

*Ariel Walker*

Ariel Walker

Cc:    Ms. Dickstein, Mr. Parlette, Ms. Lofton, Ms. Doseck, Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET · P.O BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

To: Dayton City Commission

From: Commissioner Jeffrey J. Mims

Date: November 2, 2020

Re: Police Reform Working Group Recommendation

On October 29, 2020 the Use of Force working group voted to put forward the following recommendation to the Dayton City Commission:

1. Recognizing unholstering a firearm and pointing it at a person as a reportable **show of force**

Per the working group's charter, the Dayton City Commission has 30 days to respond to the group with one of three options: accept the recommendation, reject the recommendation, or ask the group for further information to be able to evaluate the recommendation.

Accepting this recommendation does not mean that it will be implemented within the 30 day time window. Instead, it means that the City Commission directs the City Manager, Dayton Police Department, or other applicable entity to take action to implement this recommendation as soon as is practicable.

Thank you for your consideration of this recommendation.

Sincerely,

Jeffrey J. Mims
Commissioner

Cc:
Ms. Dickstein
Mr. Parlette
Ms. Lofton

Ms. Doseck
Ms. Walker
Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET · P.O BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

November 24, 2020

TO:        Police Reform Working Group- Use of Force

FROM:    Ariel Walker
            Director, Office of the City Commission

RE:        Recommendation on Show of Force

On October 29, 2020 the Use of Force Working Group voted to put forward the following recommendation to the Dayton City Commission:

Recognize unholstering a firearm and pointing it at a person as a show of force.

In reference to the this recommendation, the City Commission Agrees that any time an officer points a firearm at another person, the incident will be documented as a use of force. The City Commission has directed the City Manager to work with the Dayton Police Department to determine a timeline for implementing this new policy.

As all five Reform Committees continue their work and make recommendations, the City Commission is committed to providing updates during the due diligence and implementation process.

Thank you for your work on behalf of the City of Dayton.

Sincerely,

*Ariel Walker*

Ariel Walker

Cc:    Ms. Dickstein, Mr. Parlette, Ms. Lofton, Ms. Doseck, Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET · P.O. BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

To: Dayton City Commission

From: Commissioner Jeffrey J. Mims

Date: December 9, 2020

Re: Police Working Groups Recommendation

In an effort to create more positive encounters and interactions with police, and to reduce instances of the use of force by police, the use of force working group makes the following recommendations:

1. In conjunction with diverse community organizations, the Human Relations Council ("H.R.C"), and members of the legal community, the Dayton Police Department shall conduct annual (at minimum) "Know Your Rights" community engagement workshops within the Dayton community.

2. The goal of the "Know Your Rights" workshops shall be to provide education and resources to all members of the community regarding their rights and responsibilities throughout the legal process from the time of first contact with law enforcement.

Sincerely,

Jeffrey J. Mims
Commissioner

Cc:
Ms. Dickstein
Mr. Parlette
Ms. Lofton
Ms. Doseck
Ms. Walker
Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET • P.O. BOX 22 • DAYTON, OHIO 45401
CITY HALL • (937) 333-3636 • www.daytonohio.gov

January 11, 2021

TO: Police Reform Working Group- Use of Force

FROM: Ariel Walker
Director, Office of the City Commission

RE: Recommendation on "Know Your Rights and Responsibilities"
Program

On December 9, 2021 the Use of Force Working Group voted to put forward the following recommendations to the Dayton City Commission:

1. In conjunction with diverse community organizations, the Human Relations Council (HRC), and members of the legal community, the Dayton Police Department shall conduct annual (at minimum) "Know your Rights & Responsibilities" community engagement workshops within the Dayton community.
2. The goal of the "Know your Rights and Responsibilities" workshops shall be to provide education and resource to all members of the community regarding their rights and responsibilities throughout the legal process from the time of first contact with law enforcement.

In reference to recommendation 1, the City Commission Agrees to conduct annual "Know your Rights & Responsibilities" community engagement workshops within the Dayton community in conjunction with diverse community organizations, the Human Relations Council, and members of the legal community.

In reference to recommendation 2, The City Commission Agrees that the workshops will provide education and resources to all members of the community regarding their rights and responsibilities throughout the legal process from the time of first contact with law enforcement.

As all five Reform Committees continue their work and make recommendations, the City Commission is committed to providing updates during the due diligence and implementation process.

Thank you for your work on behalf of the City of Dayton.

Sincerely,

Ariel Walker

Cc:   Ms. Dickstein, Mr. Parlette, Ms. Lofton, Ms. Doseck, Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION
101 WEST THIRD STREET · P.O. BOX 22 · DAYTON. OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

March 1, 2021

To:  Mayor Nan Whaley
   Commissioner Matt Joseph
   Commissioner Christopher L. Shaw
   Commissioner Darryl Fairchild

From: Commissioner Jeffrey J. Mims, Jr.

Re: Police Reform Working Group Recommendations

On February 25, 2021, the Use of Force working group voted to put forward the following recommendations to the Dayton City Commission.

1. Replace the language in General Order 2.01-4, Section I. C. 1. from defuse to de-escalate

2. Change the name of General Order 3.02-2 from Response to Citizen Aggression/Resistance/Non Compliance to Use of Force

3. Insert Medical Attention language from executive order into policy

4. Insert Duty to Intervene and Report from executive order into policy

5. Insert chokehold prohibition language (except where deadly force would be justified) from training outline and executive order to policy

6. Insert language from training outline to policy on awareness of intended target and surroundings when discharging firearm

7. Insert language from training outline to policy on non-lethal munitions shot placement

8. Add language regarding the striking of an individual with an object in the head as deadly force.

Per the working group's charter, the Dayton City Commission has 30 days to respond to the group with one of three options: accept the recommendation, reject the recommendation, or ask the group for further information to be able to evaluate the recommendation.

Accepting this recommendation does not mean that it will be implemented within the 30 day time window. Instead, it means that the City Commission directs the City Manager, Dayton Police Department, or other applicable entity to take action to implement this recommendation as soon as is practicable.

Thank you for your consideration of this recommendation.

Sincerely,

Jeffrey J. Mims, Jr.
City Commissioner

Cc: Ms. Dickstein
    Mr. Parlette
    Ms. Lofton
    Ms. Doseck
    Ms. Walker
    Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET · P.O. BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

March 16, 2021

To:     Mayor Nan Whaley
        Commissioner Matt Joseph
        Commissioner Christopher L. Shaw
        Commissioner Darryl Fairchild

From:   Commissioner Jeffrey J. Mims, Jr.

Re: Police Reform Working Group Recommendations

On March 11, 2021, the Use of Force working group voted to put forward the following recommendations to the Dayton City Commission.

1. Include language referring to prohibiting the use of force against restrained persons in of Section G: Use of Force-Prohibitions subsection (1)(vi) of the Use of Force Policy.
2. Retain language referring to prohibiting the use of force to prevent a person from fleeing or resisting in Section G: Use of Force-Prohibitions subsection (1)(iv) of the Use of Force Policy.

Per the working group's charter, the Dayton City Commission has 30 days to respond to the group with one of three options: accept the recommendation, reject the recommendation, or ask the group for further information to be able to evaluate the recommendation.

Accepting this recommendation does not mean that it will be implemented within the 30 day time window. Instead, it means that the City Commission directs the City Manager, Dayton Police Department, or other applicable entity to take action to implement this recommendation as soon as is practicable.

Thank you for your consideration of this recommendation.

Sincerely,

Jeffrey J. Mims, Jr.
City Commissioner

Cc: Ms. Dickstein
    Mr. Parlette
    Ms. Lofton
    Ms. Doseck
    Ms. Walker
    Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION
101 WEST THIRD STREET · P.O. BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

March 18, 2021

TO:      Police Reform Working Group- Use of Force

FROM:   Ariel Walker
        Director, Office of the City Commission

RE:      Recommendations on Use of Force

On February 25, 2021 the Use of Force Working Group voted to put forward the following recommendations to the Dayton City Commission (abbreviated below):

1. Replace the language in General Order 2.01-4, Section I. C. 1. from "defuse" to "de-escalate".
2. Change the name of General Order 3.02-2 to "Use of Force".
3. Insert "Medical Attention" language from executive order into policy.
4. Insert "Duty to Intervene and Report" from executive order into policy.
5. Insert chokehold prohibition language (except where deadly force would be justified) from training outline and executive order to policy.
6. Insert language from training outline to policy on awareness of intended target and surroundings when discharging a firearm.
7. Insert language from training outline to policy on non-lethal munitions shot placement.
8. Add language regarding the striking of an individual with an object in the head as deadly force.

In reference to these recommendations, the City Commission Agrees. The City Commission directs the City Manager to work with DPD to ensure that all eight recommendations are included in the police policy as outlined in the recommendation.

As all five Reform Committees continue their work and make recommendations, the City Commission is committed to providing updates during the due diligence and implementation process.

Thank you for your work on behalf of the City of Dayton.

Sincerely,

Ariel Walker

Ariel Walker

Cc:    Ms. Dickstein, Mr. Parlette, Ms. Lofton, Ms. Doseck, Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
REGINA D. BLACKSHEAR



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET · P O BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

March 22, 2021

To:      Mayor Nan Whaley
          Commissioner Matt Joseph
          Commissioner Christopher L. Shaw
          Commissioner Darryl Fairchild

From:   Commissioner Jeffrey J. Mims, Jr.

Re: Police Reform Working Group Recommendations

On March 18, 2021, the Use of Force working group voted to put forward the following recommendations to the Dayton City Commission.

1. Revise the use of force policy to adopt a statement of "purpose" that provides that officers must respect the sanctity of all human life, act in all possible respects to preserve human life, do everything possible to avoid unnecessary uses of force, and minimize the force that is used, while still protecting themselves and the public (See proposed language attached).

2. Revise the use of force policy to adopt a policy statement that requires that officers use only that force which is necessary, proportional to the level of resistance/aggression/noncompliance, and objectively reasonable based on the totality of the circumstances as outlined in the Supreme Court case of Graham v. Connor, 490 US 386. Further, that when safe and feasible to do so, officers shall take all reasonable measures to de-escalate an incident and reduce the likelihood or level of use of force. Further, that any use of force that is not necessary, proportional, and objectively reasonable and does not reflect reasonable de-escalation efforts, when safe and feasible to do so, is prohibited and inconsistent with department policy. (See proposed language attached)

Per the working group's charter, the Dayton City Commission has 30 days to respond to the group with one of three options: accept the recommendation, reject the recommendation, or ask the group for further information to be able to evaluate the recommendation.

Accepting this recommendation does not mean that it will be implemented within the 30 day time window. Instead, it means that the City Commission directs the City Manager, Dayton Police Department, or other applicable entity to take action to implement this recommendation as soon as is practicable.

Thank you for your consideration of this recommendation.

Sincerely,

Jeffrey J. Mims, Jr.
City Commissioner

Cc: Ms. Dickstein
    Mr. Parlette
    Ms. Lofton
    Ms. Doseck
    Ms. Walker
    Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
REGINA D. BLACKSHEAR



# CITY of DAYTON, OHIO
## OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET · P O BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

March 27, 2021

To:     Mayor Nan Whaley
        Commissioner Matt Joseph
        Commissioner Christopher L. Shaw
        Commissioner Darryl Fairchild

From:   Commissioner Jeffrey J. Mims, Jr.

Re: Police Reform Working Group Recommendations

On March 25, 2021, the Use of Force working group voted to put forward the following recommendation to the Dayton City Commission.

1. Revise the use of force policy to adopt a statement of core principles with sections on sanctity of human life, public cooperation, de-escalation, use of force: objectively reasonable, necessary, and proportional, medical attention, duty to intervene and report, and use of force prohibitions. (See proposed language attached).

Per the working group's charter, the Dayton City Commission has 30 days to respond to the group with one of three options: accept the recommendation, reject the recommendation, or ask the group for further information to be able to evaluate the recommendation.

Accepting this recommendation does not mean that it will be implemented within the 30 day time window. Instead, it means that the City Commission directs the City Manager, Dayton Police Department, or other applicable entity to take action to implement this recommendation as soon as is practicable.

Thank you for your consideration of this recommendation.

Sincerely,

Jeffrey J. Mims, Jr.
City Commissioner

Cc: Ms. Dickstein
    Mr. Parlette
    Ms. Lofton
    Ms. Doseck
    Ms. Walker
    Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION

101 WEST THIRD STREET · P.O. BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

April 2, 2021

TO:      Police Reform Working Group- Use of Force

FROM:    Ariel Walker
           Director, Office of the City Commission

RE:      Recommendations on Use of Force

On March 16, 2021 the Use of Force Working Group voted to put forward the following recommendations to the Dayton City Commission:

1. Include language referring to prohibiting the use of force against restrained persons in Section G: Use of Force- Prohibitions subsection (1)(vi) of the Use of Force Policy.
2. Retain language referring to prohibiting the use of force to prevent a person from fleeing or resisting in Section G: Use of Force- Prohibitions subsection (1)(iv) of the Use of Force Policy.

In reference to these recommendations, the City Commission Agrees. The City Commission directs the City Manager to work with the DPD to make the recommended changes in the Use of Force Policy regarding restrained individuals and people fleeing or resisting.

As all five Reform Committees continue their work and make recommendations, the City Commission is committed to providing updates during the due diligence and implementation process.

Thank you for your work on behalf of the City of Dayton.

Sincerely,

*Ariel Walker*

Ariel Walker

Cc:     Ms. Dickstein, Mr. Parlette, Ms. Lofton, Ms. Doseck, Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
REGINA D. BLACKSHEAR



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION
101 WEST THIRD STREET · P.O. BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

April 2, 2021

To:     Mayor Nan Whaley
        Commissioner Matt Joseph
        Commissioner Christopher L. Shaw
        Commissioner Darryl Fairchild

From:   Commissioner Jeffrey J. Mims, Jr.

Re: Police Reform Working Group Recommendations

On April 1, 2021, the Use of Force working group voted to put forward the following recommendations to the Dayton City Commission.

1. Insert language of de-escalation policy developed by the training group into core principles "Section C. De-Escalation."

2. Recommend that a committee consisting of department members, community members, and members of use of force working group review and revise "Section IV. Definitions." Specifically, adopt a formal definition of "force." Revise and add definitions of other relevant concepts to align with overall policy revisions.

3. Recommend that the remaining sections of the use of force policy be reviewed by a committee consisting of department members, community members, and members of use of force working group to determine where revisions are warranted, including but not limited to, review of the following specific provision: sit, kneel, or stand on a subject's head, face, neck, except where the use of deadly force would be authorized.

Per the working group's charter, the Dayton City Commission has 30 days to respond to the group with one of three options: accept the recommendation, reject the recommendation, or ask the group for further information to be able to evaluate the recommendation.

Accepting this recommendation does not mean that it will be implemented within the 30 day time window. Instead, it means that the City Commission directs the City Manager, Dayton Police Department, or other applicable entity to take action to implement this recommendation as soon as is practicable.

Thank you for your consideration of this recommendation.

Sincerely,

Jeffrey J. Mims, Jr.
City Commissioner

Cc: Ms. Dickstein
    Mr. Parlette
    Ms. Lofton
    Ms. Doseck
    Ms. Walker
    Chief Biehl

COMMISSIONERS

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER



**CITY of DAYTON, OHIO**
OFFICE OF THE CITY COMMISSION
101 WEST THIRD STREET · P.O. BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

April 22, 2021

TO:        Police Reform Working Group- Use of Force

FROM:   Ariel Walker
            Director, Office of the City Commission

RE:        Recommendations on Use of Force

On March 27, 2021 the Use of Force Working Group voted to put forward the following recommendations to the Dayton City Commission:

1. Revise the Use of Force Policy to adopt a statement of core principles with sections on sanctity of human life, public cooperation, de-escalation, use of force: objectively reasonable, necessary, and proportional, medical attention, duty to intervene and report, and use of force prohibitions.

In reference to these recommendations and the related recommendation made on March 22 regarding the Use of Force Policy, the City Commission requests additional time during the implementation period for the Law Department to review the language and consult with national experts. They will review the statement of purpose, changing the use of force standard, and the statement of core principles with a particular focus on adding "proportionality" and "necessity".

The City Commission directs the Law Director to work with members of the Use of Force Working Group after completing additional research and consultation to inform her final recommendation to the Commission.

As all five Reform Committees continue their work and make recommendations, the City Commission is committed to providing updates during the due diligence and implementation process.

Thank you for your work on behalf of the City of Dayton.

Sincerely,

Ariel Walker

Ariel Walker

Cc:    Ms. Dickstein, Mr. Parlette, Ms. Lofton, Ms. Doseck, Chief Biehl



**COMMISSIONERS**

NAN WHALEY, MAYOR
MATT JOSEPH
JEFFREY J. MIMS, JR.
CHRISTOPHER L. SHAW
DARRYL FAIRCHILD

DIRECTOR
CITY COMMISSION OFFICE
ARIEL WALKER

CLERK OF COMMISSION
RASHELLA LAVENDER

**CITY of DAYTON, OHIO**
**OFFICE OF THE CITY COMMISSION**

101 WEST THIRD STREET · P.O. BOX 22 · DAYTON, OHIO 45401
CITY HALL · (937) 333-3636 · www.daytonohio.gov

May 6, 2021

TO:     Police Reform Working Group- Use of Force

FROM:   Ariel Walker
        Director, Office of the City Commission

RE:     Recommendations on Use of Force

On April 1, 2021 the Use of Force Working Group voted to put forward the following recommendations to the Dayton City Commission (abbreviated below):

1. Insert language of de-escalation policy developed by the training group into core principles "Section C. De-escalation".
2. Utilize a committee consisting of department members, community members, and member of the Use of Force Working Group review and revise "Section IV. Definitions", specifically adopting a formal definition of "force" and other relevant concepts.
3. The remaining sections of the Use of Force Policy be reviewed by a committee consisting of department members, community members, and member of the Working group to determine where revisions are warranted, including, but not limited to, review of the following specific provisions: sit, kneel, or stand on a subject's head, race, neck, except where use of deadly force would be authorized.

In reference to recommendation 1 regarding the insertion of language of the de-escalation policy developed by the training group into core principles "Section C. De-escalation", the City Commission Agrees. The City Commission directs the City Manager to work with the DPD to complete this policy change.

In reference to recommendation 2 regarding a committee consisting of department members, community members, and member of the Use of Force Working Group review and revise "Section IV. Definitions", specifically adopting a formal definition of "force" and other relevant concepts, the City Commission Agrees. The City Commission directs the City Manager to work with the DPD and Law Department to define "force" and identify other relevant concepts to be reviewed.

In reference to recommendation 3 that the remaining sections of the Use of Force Policy be reviewed by a committee consisting of department members, community members, and member of the Working group to determine where revisions are

warranted, including, but not limited to, review of the following specific provisions: sit, kneel, or stand on a subject's head, race, neck, except where use of deadly force would be authorized, the City Commission Agrees. The City Commission directs the City Manager to work with the DPD and Law Department to review these provisions and work with the new Use of Force Committee when seated.

As all five Reform Committees continue their work and make recommendations, the City Commission is committed to providing updates during the due diligence and implementation process.

Thank you for your work on behalf of the City of Dayton.

Sincerely,

*Ariel Walker*

Ariel Walker

Cc:     Ms. Dickstein, Mr. Parlette, Ms. Lofton, Ms. Doseck, Chief Biehl

| 3.03-2 | DAYTON POLICE DEPARTMENT<br>GENERAL ORDER<br><br>**USE OF FORCE** |  |
|---|---|---|
| KAMRAN AFZAL – DIRECTOR AND CHIEF OF POLICE | | Rev. 05/25 |

## POLICY STATEMENT

The primary purpose of this policy is to establish guidelines relative to the use of force and an officer's duties before, during, and after the use of force. Sworn law enforcement officers have been granted the authority to use force when necessary to accomplish lawful ends. That authority is grounded in the responsibility of officers to comply with the laws of the State of Ohio regarding the use of force and to comply with the provisions of this policy. The responsible exercise of this authority is among the most critical aspects of law enforcement.

A strong partnership with the public is essential for effective law enforcement. Excessive or unjustified force in response to resistance/aggression/non-compliance undermines that partnership and community confidence in the department and its officers and will not be tolerated. Officers will act with a high degree of ethics, professionalism, and respect for the public in a manner that promotes trust between the department and the communities that it serves.

Equally important is law enforcement's obligation to prepare individual officers in the best way possible to exercise that authority. In situations where law enforcement officers are justified in using force, the utmost restraint should be exercised. Use of force should never be considered routine. It is the policy of the Dayton Police Department that officers hold the highest regard for the sanctity of human life and the inherent dignity, liberty, and worth of all individuals.

It is the policy of this department to use only that force which is proportional to the level of resistance/aggression/non-compliance, and objectively reasonable based on the totality of the circumstances as outlined in the Supreme Court case of *Graham v. Connor, 490 US 386*, protecting both officers and the public. Proportional force is defined as the level of force used by each individual officer based on the totality of circumstances surrounding the immediate situation, including the presence of imminent danger to officers or others.

Because of the impact that incidents involving the use of force have on the department and the community, it is important that all incidents be promptly and completely documented, and fairly and accurately investigated. Thorough documentation and investigation are necessary to protect the rights of the public, the officer, and the interests of the department and the city.

The department recognizes that officers are often forced to make split second decisions about the use of force, in tense, uncertain, and rapidly evolving situations. Every incident will be reviewed based on the totality of the circumstances known by the officer at the time, and from the perspective of a reasonable officer in the same or similar circumstances. Any use of force that is not proportional and objectively reasonable and does not reflect reasonable de-escalation efforts, when safe and feasible to do so, is inconsistent with department policy.

## CONTENTS

I.     DEFINITIONS
II.    RESPONSES REQUIRING INVESTIGATION – STRIKES / FIREARMS / LESS-LETHAL / OC / TASERS
III.   ON DUTY OFFICER RESPONSIBILITIES
IV.    OFF DUTY OFFICER RESPONSIBILITIES
V.     SUPERVISOR RESPONSIBILITIES
VI.    USE OF CHOKE HOLD OR VASCULAR NECK RESTRAINT
VII.   ANNUAL REPORTING

I.   **DEFINITIONS**

    A.   **AGGRESSION** – the behavior of a subject to exert himself so as to counteract or defeat an officer's commands.

    B.   **COMPLIANT** – the subject is cooperative and voluntarily follows verbal commands.

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**3.03-2**
Page **1** of **14**
Rev. 05/25



C. **NON-VIOLENT PASSIVE RESISTANCE** – a method of protest commonly used during nonviolent demonstrations where a subject does not respond to an officer's commands, refuses to move, becomes limp or dead weight (i.e., nonviolent protests against government entities, abortions clinics).

D. **NON-COMPLIANT** – when placed under or being informed of their arrests, the subject refuses to cooperate and does not respond to verbal commands but takes no verbal/physical actions against an officer.

E. **ACTIVE RESISTANCE** – the subject actively resists arrest through their words and/or actions or takes aggressive action against an officer.

F. **RESPONSE** – means physical power or compulsion used to affect the behavior of a subject. Physical power is any physical control technique used to coerce or restrain a subject. Compulsion includes the officer's presence and verbal commands that are used to influence the behavior of a subject.

G. **NON-DEADLY RESPONSE** – means any response that is neither likely nor intended to cause death or serious injury.

H. **LESS-LETHAL WEAPONS** – are weapons that are used in a manner not intended to cause death or serious injury.

I. **DEADLY/LETHAL OPTIONS** – means any response, which creates a substantial risk that it will proximately result in the death of any person.

J. **SERIOUS PHYSICAL HARM** – means any physical harm that: carries a substantial risk of death, permanent partial or total incapacity; involves some temporary, substantial incapacity; involves some permanent or serious temporary disfigurement; involves acute pain of such duration as to result in substantial suffering; involves any degree of prolonged or unmanageable pain; or that involves any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment.

K. **OBJECTIVELY REASONABLE RESPONSE** – means the level of response that is within the bounds of what an ordinary and prudent officer would use in a similar way under similar circumstances as outlined in the Supreme Court case of *Graham v. Conner* 490 U.S. 386, 109 S. Ct. 1865 and the guidelines set forth in the Supreme Court case of *Tennessee v. Garner*, 471 U.S. 1 (1985).

L. **IN-CUSTODY DEATH** – The death of an individual while in custody or while attempts to effect custody are being made.

M. **ACCIDENTAL DISCHARGE** – any unintentional discharge of an officer's firearm.

N. **NECK RESTRAINT**- any act that may impede the normal breathing or circulation of the blood by applying pressure to the throat, neck, windpipe, arteries, or vascular system, or by covering the nose and mouth; including but not limited to chokeholds, strangleholds, carotid restraints, or lateral vascular restraint.

O. **SHOW OF FORCE** – Whenever an officer points a firearm at a citizen while in the performance of his or her duties. The specific intent is to decrease the officer's reaction time and, when used in conjunction with verbal commands, to encourage subjects to stop their aggression or non-compliance.

P. **REASONABLENESS STANDARD** – Officers may only point a firearm at a person when it is objectively reasonable to do so under the totality of the circumstances faced by the officer on the scene. While reasonableness is not capable of precise definition, officers may consider factors that include, but are not limited to, the nature of the incident, the risk of harm to the officer or others, and the level of threat or resistance presented or maintained by the subject (e.g., possession or access to weapons).

Q. **PROPORTIONAL FORCE** - The level of force used by each individual officer based on the totality of circumstances surrounding the immediate situation, including the presence of imminent danger to officers or others. Officers will use only the force that is proportional to the threat, actions, and level of resistance offered by a subject. This may include using greater force or a different type of force than that used by the subject. The greater the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be necessary to overcome it. When or if the subject offers less resistance, however, the officer will decrease the amount or type of force accordingly. Force used by an officer shall

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.



proportionally decrease as the level of resistance by the subject decreases.

## II. POLICE USE OF FORCE REQUIRING INVESTIGATION AND DOCUMENTATION

For the purpose of this policy, reportable Police responses to citizen resistance/aggression/non-compliance include the following:

### A. FIREARMS

**Anytime an officer discharges a firearm at another person, regardless of whether that person is struck by the projectile, and regardless of whether the officer is on or off duty.**

1. Except as specified in Section II.A.3., investigations of discharges involving firearms will be reported and investigated as directed in General Orders 3.03-5 Officer Involved Shooting and 3.03-6 Firearms Discharges Involving Animals.

    a. Regardless of the crime or the legal justification for a deadly force response towards a suspected offender, officers are reminded that their basic responsibility is to protect the public. Officers are to be particularly cautious when discharging their firearm under conditions that would subject innocent bystanders to substantial danger. **Officers should not discharge their firearm indiscriminately without awareness of their intended target and all surroundings.**

    b. Officers will not discharge firearms except in the following circumstances, and then, ONLY AFTER ALL REASONABLE ALTERNATIVES HAVE BEEN EXHAUSTED, including verbal warnings where feasible:

        1) When it becomes **absolutely** necessary to protect themselves or other persons from death or serious physical harm.

        2) To arrest a suspect who has committed a **serious felony, involving the infliction or threatened infliction of serious physical harm,** or to prevent the escape of such a felony suspect, or to recapture such a felon while he/she is attempting to escape when a substantial risk exists that a person sought will cause death or great bodily harm to others if apprehension is delayed. An officer must have **witnessed the crime** or **firmly believe and be convinced** that the suspect has committed a serious felony for which the use of deadly force is permissible.

        3) An officer will not discharge firearms from or at a moving vehicle unless they reasonably believe that such an action is in defense of human life.

            - Officers must use tactical positioning of vehicles and tactical vehicle approaches in order to minimize the danger presented by occupied vehicles.

            - Officers must not deliberately place themselves in the path of a moving vehicle. An officer will attempt to move from the path of the motor vehicle and/or seek cover when possible.

        4) To kill a **dangerous animal** or one so badly injured that humaneness requires an immediate end to its suffering.

        5) During target practice at an approved target range.

    c. FIREARMS WILL NEVER BE DISCHARGED AS WARNING SHOTS.

    d. Discharge of a shotgun or other weapon for the delivery of **Less-lethal** munitions by a department member who has been trained and certified in their use by the Commander of the S.W.A.T. Team or the Range Staff and specifically authorized to deploy such weapons by the Chief of Police will be investigated as a *Use of Force* incident.

2. **ACCIDENTAL DISCHARGE OF FIREARMS**

    a. **ON-DUTY OFFICER'S RESPONSIBILITIES**

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**3.03-2**
Page 3 of **15**
Rev. 05/25



**General Order 3.03-2**                                                      **Use of Force**

1) Whenever an on-duty officer accidently discharges a firearm, or becomes aware of allegations that they have accidentally discharged a firearm, they must immediately notify an on-duty supervisor. In the event that a supervisory officer is involved in a use of firearms incident, a supervisor of higher rank will be notified of the incident.

2) In addition to any other reports submitted relating to the incident, the officer involved in the firearms discharge incident will complete a Special Report or other statement as directed by a supervisor or a member of the Professional Standards Bureau. That report will contain all information pertinent to the incident, including the names of all known witnesses to the incident. The report will be completed as soon as possible and not later than completion of the officer'(s) tour of duty.

3) Any on-duty officer who witnesses or has knowledge of a discharge of firearms by another officer or becomes aware of allegations of discharge of firearms by another officer will immediately ensure that an on-duty supervisor is aware of the incident.

b. **OFF-DUTY OFFICERS' RESPONSIBILITIES**

1) Whenever an off-duty officer accidently discharges a firearm, or becomes aware of allegations that they have accidentally discharged a firearm under those circumstances, they must notify the Regional Dispatch Center (RDC) of the incident as soon as possible and also request contact with an on-duty supervisor.

   a) If the incident occurred in the City of Dayton, an appropriate supervisor will be notified by the RDC and will respond to the scene to investigate the incident.

   b) If the incident occurred outside the corporate limits of the City of Dayton, the off-duty officer must contact an on-duty supervisor. The supervisor will contact the officer and determine the facts of the incident. The supervisor will then notify the Command Staff to determine notification of the outside jurisdiction and further investigation.

2) The involved officer(s) will completely and accurately report the details of the incident to the investigating supervisor.

3) The officer should request that copies of any reports completed by any responding local police agency be forwarded to the investigating supervisor.

4) The officer(s) involved in the incident will complete a Special Report as soon as possible and not more than 24 hours after the incident occurred. In the event the officer will be out of the city for a period of time on pre-approved leave or business travel, the report will be submitted within 24 hours of the officer's return to the city.

c. The minimum disciplinary action for an accidental discharge of a firearm at a location other than the Training Academy range will be a Written Reprimand. The Chief of Police and/or their designee has the option of accepting the Written Reprimand or ordering the Use of Firearms Review Committee to convene for further investigation and recommendation.

d. If the accidental discharge occurs at the Training Academy range, an investigation will be completed and recommendations made dependent upon the severity of the incident. The Chief of Police and/or their designee has the option of accepting the recommendation of the investigating supervisor or ordering the Use of Firearms Review Committee to convene for further investigation and recommendation.

B. **LESS-LETHAL**

Discharge of a shotgun or other weapon for the delivery of **Less-lethal** munitions by a department member who has been trained and certified in their use by the Commander of the S.W.A.T. Team and/or range staff and specifically authorized to deploy such weapons by the Chief of Police will be investigated as a *Use of Force* incident. The use of **Less-lethal** weapons will be consistent with the training received.

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**General Order 3.03-2**                                                 **Use of Force**

1. The use of **Less-lethal** munitions is placed at the high intermediate level of the action-response continuum, akin to an extension of the impact weapon allowing extra distance between the officer and the individual. Their use will almost certainly result in injuries. As with any impact weapon, the potential exists for serious physical harm or death to result from its use or misuse.

2. Officers deploying **Less-lethal** munitions may respond to resistance or aggression in accordance with the objective reasonableness standard and in compliance with applicable state law, department policies and training, as determined by the actions of the individual, the environment in which the individual is encountered and the totality of the circumstances.

   a. Officers will be especially mindful of shot placement in order to avoid serious physical harm and/or death. The groin area should not be intentionally targeted.

   b. Shots delivered to a subject's head, spine, and upper chest carry the greatest potential for serious or fatal injury and shall be avoided when possible. These areas should only be considered in circumstances where the use of deadly force is justified.

3. It is the individual officer's responsibility to inspect the ammunition to ensure that **Less-lethal** ammunition is in or carried with the **Less-lethal** shotgun or other weapon prior to use.

4. Officers deploying Less-lethal munitions will communicate over the radio to on scene personnel, "**I have Less-lethal, I have Less-lethal, I have Less-lethal**".

5. A cover officer armed with a lethal weapon must always remain with the officer using a **Less-lethal** weapon.

6. Spent munitions and shell casings will be collected and tagged into the property room as evidence.

7. The following is a non-exclusive list of circumstances that may require the use of **Less-lethal** munitions:

   a. To subdue an actively hostile individual who has resisted other control means.

   b. To de-escalate a dangerous individual or situation to protect officers or others from harm, including an individual from serious self-inflicted injury.

   c. Individuals armed with blunt or edged weapons.

   d. Violent and/or combative, intoxicated or mentally disturbed individuals.

   e. Selective intervention in crowd control situations.

      1) To be employed only upon decision from the on-scene commander, preferably in consultation with the SWAT (Special Weapons and Tactics) Commander.

      2) It is to be used only against individuals or small groups specifically identified as agitators or leaders and preferably by SWAT team members only.

      3) Supervisors must authorize deploying Less-lethal munitions ("beanbag" shotguns, 40mm foam rounds) into a crowd. A verbal warning must be given unless it would present a danger to police officers or others to give such a warning.

      Any deployment of the "beanbag" shotgun (Patrol Operations or SWAT Personnel), 40mm foam round during crowd management / control requires:

      - Specific targeting of a subject by the officer.

      - Under no circumstances should any of these devices be deployed into a crowd without first identifying a specific target that represents an imminent risk of death or physical injury to the officer or others.

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**3.03-2**
Page 5 of 15
Rev. 05/25



- The officer must be reasonably sure that the weapons will not strike other individuals in the crowd who pose no threat of violence.

## C. ON DUTY NON-FIREARMS

**Anytime an on-duty officer knowingly strikes, injures, or uses Oleoresin Capsicum (OC Spray) or the TASER X-26 or TASER 7 on another person.**

1. The unmitigated or indiscriminate striking of an individual in the head with any flashlight, baton, or related safety equipment carried by any officer, is strictly prohibited and constitutes deadly force.

2. <u>OLEORESIN CAPSICUM (OC Spray)</u>

   Dayton police officers that have been trained and certified by the Dayton Police Academy are authorized to carry and use Oleoresin Capsicum (OC Spray). The use of all other chemical agents is restricted to specially trained and authorized personnel and members of the SWAT Team.

   a. The following is a non-exclusive list of when the use of OC Spray is appropriate:

      - To subdue individuals engaged in active resistance who have ignored verbal commands and are being arrested.
      - When physical control techniques are warranted (physical resistance).
      - When officer injury is possible and/or anticipated.
      - OC may be used on animals when officers would be justified in shooting an attacking animal.

   b. Unless a substantial risk of escape, injury and/or property damage exists, officers are not to use OC spray on a handcuffed person.

   c. Officers in a situation where use of OC spray is anticipated, will, if circumstances permit, verbally warn the individual they will be sprayed if they do not cease their actions.

   d. OC use is appropriate only to the extent needed to bring an individual under control/arrest.

   e. Replacement OC spray canisters can be obtained from the Academy during normal business hours, officers will be required to complete Form F-521 for replacement.

3. <u>TASER X-26 and TASER 7</u>

   Dayton police officers that have been trained and certified by the Dayton Police Academy are authorized to carry and use the TASER X-26 and/or the TASER 7.

   a. The following is a non-exclusive list of when the use of a TASER is appropriate:

      - To subdue individuals engaged in active resistance who have ignored verbal commands and are being arrested.
      - When physical control techniques are warranted (physical resistance).
      - When officer injury is possible and/or anticipated.
      - Persons who have expressed the intent and have the means to commit suicide.

   b. Officers deploying a TASER will communicate their deployment to other on scene personnel if the situation permits.

   c. Except in extreme circumstances, officers should not use the TASER when it is reasonable to believe that incapacitation of the person may result in serious injury or death due to their physical location (i.e., on a ladder, roof, bridge, or in water more than several inches deep, or deployment from a moving vehicle). Officers should be mindful if the individual is visibly or known to be pregnant, elderly, physically frail, developmentally disabled, of very low body mass, or of very young age, and may consider alternative less-lethal control options before deploying a TASER. TASER energy weapon use on these individuals could increase the risk of death or serious injury.

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**General Order 3.03-2**                                                    **Use of Force**



and transport the prisoner to a medical facility immediately.

    b.   <u>TASER Medical Treatment</u>

        1)   Persons that have been struck with the TASER probes should be immediately removed from the scene to a hospital if the probes are located in a sensitive area of the body (anything involving the head, neck, breast or nipples, groin or genitals), otherwise, an officer or supervisor may remove the probes and render first aid procedures.

- If the probes are being removed at the scene, officers shall wear latex gloves when removing probes from the skin. A sanitizing spray or gel shall be administered to each puncture site along with a Band-Aid (if needed) as soon as practical.

- Only sworn personnel trained and certified with the TASER 7 will be allowed to remove probes from a person after a TASER 7 deployment. In addition, TASER 7 certified personnel should carry a probe removal tool on their person or in a police vehicle where the probe removal tool can be easily retrieved.

- TASER X-26 probes will be collected and safely stored in the TASER X-26 cartridge or other "Sharps" container and marked, tagged and placed in the property room as per the guidelines for submitting "Biohazard" evidence in General Order 1.06-1 Evidence and Impounded Property.

        2)   Individuals who have been subjected to a Taser and exhibit signs of drug and/or alcohol intoxication or display symptoms of an unknown medical condition to the extent of near-incoherence should be transported to the hospital for medical assessment. (See Section B below)

    4.   Every attempt should be made to contact and identify witnesses to the incident and to request that they remain on the scene until the investigating supervisor arrives.

B.   Officers should be cognizant of serious and potentially deadly medical conditions, often complicated by drug intoxication, involving psychotic behavior, elevated body temperature, and an extreme fight-or-flight response by the nervous system. Failure to recognize these symptoms and involve emergency medical services (EMS) to provide appropriate medical treatment, may lead to death. If a person exhibits some or all of these symptoms, immediate medical attention may be warranted:

- Incoherent or irrational speech
- Aggressive, agitated or disorderly behavior
- Extraordinary strength or resistance to pain
- Profuse sweating
- High heart rate
- Public disrobing (partially or fully naked, even in the winter months)
- Attraction to lights, mirrors, glass and water

If you observe someone exhibiting these symptoms, remember:

- Rapid control of the situation and timely execution of medical evaluation are important
- Subjects often do not respond to verbal redirection
- Attempts at physical control may not be as effective given extreme levels of strength and resistance to painful stimuli
- Ongoing physical struggle can worsen a subject's innate fight-or-flight system, which can raise a patient's temperature, cause changes in the body's acid-base balance, and increase the risk of sudden death
- Call for EMS and get medical treatment as soon as possible
- The safety of officers and the general public is paramount

C.   When the investigating supervisor arrives, the officer(s) involved in the incident will provide a complete and accurate description of the incident.

---

**3.03-2**
Page **10** of **15**
Rev. 05/25

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**General Order 3.03-2**                                                              **Use of Force**

failure to comply with lawful orders from authorities.

### D. OFF-DUTY NON-FIREARMS

Anytime an off-duty officer knowingly strikes or injures, or uses Oleoresin Capsicum (OC Spray) or a TASER on another person under any of the following circumstances:

1. When in police uniform.

2. When taking or attempting to take law enforcement action (i.e., in the course of off-duty employment, making an off-duty arrest, etc.).

3. When the officer identifies themselves as a police officer and a *Use of Force* incident results.

4. When the officer uses any issued Oleoresin Capsicum (OC Spray) or TASER.

### III. ON-DUTY OFFICER'S RESPONSIBILITIES

Whenever on-duty officers are involved in, witness or are informed of a complaint regarding a *Use of Force* incident (including chemical irritant or TASER accidental discharges), they must immediately notify an on-duty supervisor.

In the event that a supervisory officer is involved in a *Use of Force* incident, a supervisor of higher rank will be notified of the incident. In the event that a Watch Commander or appropriate Division / Bureau Commander is not available, the Professional Standards Bureau will be notified of the *Use of Force*.

A. Unless hostile conditions or serious injuries dictate otherwise, officers should remain on the scene of the *Use of Force* incident with suspects and witnesses until the arrival of the investigating supervisor.

   1. Once the scene is safe and as soon as practical, whenever an individual is injured, complains of injury, or requests medical attention, officers will immediately request appropriate medical aid for the injured person and may provide appropriate medical care consistent with their training to any individual who has visible injuries, complains of being injured, or requests medical attention. This may include providing first aid and/or arranging for transportation to an emergency medical facility. Officers will treat injured persons, whether another officer, a member of the public, or a subject, with dignity and respect.

   2. If possible, in the event that immediate medical attention is required, someone other than the involved officer(s) should remove the person against whom a response was directed to the hospital.

   3. The person against whom a response was directed should be advised that they will receive medical treatment as soon as possible.

      a. Chemical Irritant Medical Treatment - If possible, officers will commence cleansing techniques at the scene, prior to transporting the subject to the jail. All persons who have been sprayed with OC will be treated with the chemical agent neutralizer to have the OC residue removed from the skin, eyes, etc.

         1) Eyewash stations will be used prior to booking the person into the jail if they are having difficulties with their eyes **(Remember, water will wash away the chemical agent neutralizer)**. An eyewash station is available in the MCSO jail sallyport.

         2) If a prisoner is having medical difficulties after first aid is rendered, then the supervisor will have the option of either having the prisoner transported to a medical facility or calling a paramedic from the Dayton Fire Department.

         3) The MCSO jail has medical staff that checks prisoners prior to booking and can make a determination if further medical intervention is necessary. If their staff determines that a prisoner needs to be removed to a medical facility, then the transporting officer will notify their supervisor

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**3.03-2**
Page **9** of **15**
Rev. 05/25



l.    Anytime a discharge occurs, the serial numbers of both the TASER and any expended cartridge(s) will be documented in a *BlueTeam Internal Investigation Incident Report* or *BlueTeam Internal Complaint Report*.

m.    Only sworn personnel trained and certified by the Dayton Police Academy to use the TASER 7 are authorized to carry the TASER 7. While carried on-duty, each TASER 7 will be loaded with one (1) Close-Quarters (CQ) cartridge in Bay 1, and one (1) Stand-Off (SO) cartridge in Bay 2.

n.    Discharge of the TASER 7 against a person, successful of not, and in either drive stun or spiral dart mode, will be considered a deployment. Those issued a TASER 7 will ensure the battery is docked after every deployment, or once every 30 days regardless of deployment. Docking the TASER 7 battery allows for software updates to be uploaded to the TASER 7 and permits Department personnel assigned as TASER 7 Administrators to remotely see reports regarding its use and critical faults that may require maintenance.

o.    Personnel equipped with the TASER are required to test the device for operability when donning the TASER during preparation for duty. Personnel will remove TASER cartridges prior to testing.

- Any malfunctions are to be reported to a supervisor immediately.
- Officers are to discontinue carrying the inoperative TASER until it can be replaced.
- Supervisors will contact the Academy during normal business hours to secure replacement TASERS.
- Personnel issued the TASER 7 will only carry the TASER 7 in the Department issued Safariland Holster or a Blackhawk TASER 7 Holster.

4.   NON-LETHAL PEPPERBALL SYSTEM

Dayton police officers that have been trained and certified by Dayton Police Department Certified PepperBall Instructors are authorized to carry and use the PepperBall System Launcher, and deploy PepperBall projectiles, a hard plastic frangible sphere that is designed to burst upon impact. These PepperBall projectiles may include organic irritant made of non-flammable, PAVA powder.

a.    Officers deploying PepperBall launchers will communicate to on scene personnel, "I have PepperBall, I have PepperBall, I have PepperBall."

b.    It is required to have at least one cover officer armed with a lethal weapon accompanying the officer deploying a PepperBall launcher. It is preferable to have an additional officer equipped with a less-lethal weapon providing additional coverage.

c.    PepperBall projectiles can be utilized for direct impact or area saturation deployment.

     1)   For direct impact, the targeting of PepperBall projectiles should mainly focus on areas below the sternum.
     2)   Targeting the head, neck, and spine should be strictly avoided when possible.

d.    The following is a non-exclusive list of when PepperBall System is appropriate:

     1)   When dealing with barricaded individual(s)
          - In vehicles
          - In structures
          - In rooms

     2)   When area denial is necessary to keep individual(s) away.

     3)   When individual(s) are engaged in active resistance and who have ignored verbal commands—whether or not they are being arrested.

     4)   When crowds become disorderly.
          - A disorderly crowd is a group of individuals whose collective behavior disrupts public order or threatens public safety. This behavior may include loud or aggressive actions, physical altercations, vandalism, blocking thoroughfares, and

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**General Order 3.03-2**  **Use of Force**



D.  In addition to any other reports submitted relating to the incident, a *BlueTeam Internal Investigation Incident Report* will be initiated for each individual against whom a response was directed or who has alleged a *Use of Force* incident against them by the officer(s) employing the response or involved in the allegation.

   - That report will contain all information pertinent to the *Use of Force* incident and will indicate the type of incident. The report will be completed as soon as possible, and not later than the next business day.
   - The investigating supervisor may require additional information by requesting a Special Report from officers involved in or witnessing the incident.
   - All individual reports arising out of the same incident will be directed to the investigating supervisor.

E.  For OC spray accidental discharges where no non-departmental personnel were sprayed, the officer will fully describe the circumstances to his supervisor, who will then detail the incident in a *BlueTeam Internal Complaint Receipt.*

F.  Any on-duty officer who witnesses a *Use of Force* incident by another officer or becomes aware of allegations of a *Use of Force* incident by another officer will ensure that an on-duty supervisor is aware of the incident.

G.  Duty to Intervene- Any officer present and observing another officer engaging in an unauthorized use of force must, when in a position to do so safely, intervene to prevent the violation. Failure to do so may result in disciplinary action up to and including dismissal. Officers must promptly report any such violations to a supervisor.

H.  Use of Force-Prohibitions

   1.  Officers may not use or threaten to use force for the following reasons:

      - To prevent a person from resisting or fleeing in the future
      - Against persons who are handcuffed, and/or restrained and compliant, where their actions present no substantial risk of escape, injury, and/or property damage

I.  De-escalation- De-escalation is a desired outcome achieved by utilizing decision-making, communication, and tactics to attempt to resolve conflict, or potential conflict, ethically based on the preservation of life and life priority system. De-escalation tactics and techniques are actions used by officers, when safe and feasible without compromising law enforcement priorities, that seek to minimize the likelihood of the need to use force during an incident and increase the likelihood of voluntary compliance. General Order 2.01-10 (De-Escalation) is incorporated herein in its entirety by reference.

J.  **Show of Force**

   1.  Officers are required to document a Show of Force by completing a Field Interview Card (FIC) before the end of the officer's shift. This FIC will include the lethality of firearm pointed and reason. In situations where multiple officers point a firearm at a citizen, one FIC screen will allow up to nine (9) additional PDAs to be entered. If there are more than ten officers involved, additional FIC entries will be necessary.

      a.  Officers enter the FIC, choosing the "1-DETL/JUV" option at the bottom of the screen to navigate to the DETAIL screen.

      b.  On the DETAIL screen, complete the sections for weapon information and the addition of other officer's PDAs

   2.  The unholstering, display of a firearm, having the firearm in a "ready" position (e.g., low ready position), or any other position during the course of an incident will not be considered a Show of Force unless the firearm is pointed at a citizen.

   3.  Officers are reminded that officer safety is imperative and to rely on their training. Officers should not keep their firearm at a low-ready position or not point it at a citizen in dangerous situations to avoid completing the Show of Force FIC.

   4.  Officers should be aware that completion of this Show of Force FIC will not show in the in-car MDCs

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**3.03-2**
Page **11** of **15**
Rev. 05/25

**General Order 3.03-2**                                                      **Use of Force**



(Mobile Data Computers) on future inquiries. If this is desired, the completing officer should use the "duplicate" function at the bottom of the screen and change the FIC type.

## IV. OFF-DUTY OFFICERS' RESPONSIBILITIES

A. Whenever an off-duty officer is involved in a *Use of Force* incident under circumstances described in Section II.C. of this policy, or becomes aware of allegations of a *Use of Force* incident against them under those circumstances, they must notify the RDC of the incident as soon as possible. If the incident occurred outside the corporate limits of the City of Dayton, the officer involved will ensure the appropriate local police jurisdiction is notified and requested to respond to the scene.

1. If the incident occurred within the City of Dayton an appropriate supervisor will be notified by the RDC Supervisor and will respond to the scene to investigate the incident.

2. If the incident occurred outside the corporate limits of the City of Dayton but within 15 miles of the city, the investigating supervisor will respond to the scene and proceed with the investigation to the extent that the investigation does not conflict with the policies and procedures of the outside police jurisdiction.

3. If the incident occurred more than 15 miles from the City of Dayton, the involved officer will provide the RDC Supervisor with a telephone number where they can be contacted by the investigating supervisor as soon as is possible.

B. The involved officer(s) will completely and accurately report the details of the incident to the investigating supervisor. In cases as described in Section IV.A.3. above, the officer(s) will make their report to the investigating supervisor by telephone as soon as is practical.

C. If the incident occurred outside the City of Dayton, the involved officer will request that photographs be taken of the person against whom a response was directed or who made allegations of a *Use of Force* incident against the officer. The officer should also request that copies of any reports completed by the local police agency be forwarded to the Dayton Police Professional Standards Bureau.

D. The officer(s) involved in the incident will submit a Special Report to their supervisor as soon as possible and not more than 24 hours after the incident occurred. In the event the officer will be out of the city for a period of time on pre-approved leave or business travel, the report will be submitted within 24 hours of the officer's return to the city and a copy forwarded to the Professional Standards Bureau.

## V. SUPERVISOR'S RESPONSIBILITY

A. The prompt and thorough investigation of *Use of Force* incidents, allegations of a *Use of Force* incident and use of chemical irritants or a TASER require that an appropriate supervisor be immediately notified and respond to the scene, except as provided in Section IV.A.3. of this policy.

1. In the event the immediate supervisor of the officer(s) involved in the incident is not available to respond, the RDC Supervisor will dispatch another supervisor of appropriate rank to the scene or notify the Professional Standards Bureau to respond.

2. The supervisor who is dispatched to the scene will conduct and submit a full investigation of the incident, regardless of whether the involved officer(s) are under their command.

B. Certain incidents may require the response of personnel from the Professional Standards Bureau or other specialized units, who will assume responsibility for completing the investigation. The supervisor who initially responds to the scene will submit a summary of their observations to personnel from the Professional Standards Bureau or other specialized units prior to clearing the scene.

1. The investigating supervisor will contact the involved officers and assess the seriousness of the incident. In the event that a *Use of Force* incident has resulted in serious injury (requiring hospitalization) to a citizen or an officer, the Professional Standards Bureau will be requested at the scene. In the event a citizen or an officer has received injuries, which are life threatening or fatal, the Homicide Unit will also be requested at the scene.

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**General Order 3.03-2**                                                    **Use of Force**

2.  If serious physical harm or death results from **Less-lethal** use, the Homicide Unit, the Professional Standards Bureau, and the Range Supervisor will be notified. The Homicide Unit will have authority over any criminal investigation. The Professional Standards Bureau will have authority over any administrative investigation. The Range Supervisor will assist and provide technical expertise specific to **Less-lethal** munitions.

3.  The Professional Standards Bureau will be responsible for forwarding a copy of the *BlueTeam Internal Investigation Incident Report* to the Range Supervisor.

C.  The investigating supervisor will separately interview the officer(s) involved in the incident and any officers witnessing the incident; civilian witnesses to the incident; and the person against whom a response was directed or who has alleged a *Use of Force* incident against them. Whenever possible, written statements should be taken from all civilians interviewed during the investigation and documented in the supervisor's summary and attached to their file.

D.  <u>Supervisor Responsibilities when a TASER is Utilized</u>:

1.  The report must indicate if the TASER was deployed with the probes or as a stun gun and how many times the individual was shocked.

2.  Supervisors, only when needed, can contact the Academy for the TASER to be downloaded. Currently TASER's are only downloaded if there is a malfunction or in a use of force case or alleged case that requires it.

3.  Supervisors responding to a TASER 7 deployment will ensure the TASER 7 operator that deployed the device returns to his/her respective District to dock the battery at the earliest possible convenience. Supervisors conducting a BlueTeam Internal Investigation related to a TASER 7 deployment will download the involved battery log and attach it to the related Case File in Evidence.com. This will also be documented in the narrative portion of the associated BlueTeam Internal Investigation. The Investigating Supervisor will also email the Dayton Police Academy email group so replacement cartridges can be ordered and distributed.

4.  If the supervisor is not a certified TASER operator, they are to have the dispatcher contact a certified TASER supervisor or officer to respond to their location to consult on the TASER usage and assist in downloading the unit's data.

E.  When a *Use of Force* incident occurs against an individual, the supervisor will assure that the individual is conveyed to a hospital for medical treatment **if warranted** (i.e., no visible injuries, minor injuries requiring first aid only, etc.). If an individual refuses treatment to medical personnel at the hospital, officers must document the refusal and to whom they refused. In cases where a *Use of Force* incident has been alleged, the supervisor will evaluate the need for medical treatment and make appropriate arrangements for such treatment if necessary.

The transporting crew will advise intake personnel at the jail of the alleged injury and stand by until the jail paramedic examines the prisoner. For juveniles, refer to General Order 2.05-1 Juveniles, Section III.B.2.

F.  All actual or claimed injuries will be photographed by the investigating supervisor, a FST (Forensic Services Technician) or Bureau of Identification personnel using a digital camera. In the event the incident occurred outside the City of Dayton, the supervisor will request that the outside police agency obtain those photographs.

1.  Photographs of visible injuries should include a scale of measurement. The body area of claimed injuries or injuries that are not visible should be similarly photographed.

    • Photographs of the areas of the body where TASER probes connected will be taken.

2.  Injuries concealed by clothing should be uncovered when photographed.

3.  Photographs of injuries to private body areas will be taken and witnessed only by a supervisor or FST of the same sex as the individual being photographed or by hospital personnel.

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**3.03-2**
Page **13** of **15**
Rev. 05/25

General Order 3.03-2           Use of Force

4. Uncooperative individuals should be photographed "as is" without physical restraint to document their lack of cooperation.

5. When no injuries are claimed, a full-length photograph will be taken of the individual.

6. The attending physician or head nurse should be notified prior to taking any photographs of a patient in the hospital.

G. Guidelines For Use of Digital Cameras In Administrative Investigations

1. The supervisor taking the photograph will document in their report the date/time, description of the subject of the photograph and the location where the photograph was taken.

2. Do not rename photograph files when attaching them to a report.

3. The camera disk is to be reused and not kept as the original. The photograph files in BlueTeam will become the original photographs.

H. The investigating supervisor will prepare and submit a *BlueTeam Internal Investigation Incident Report* Administrative Investigation detailing their investigation, including a synopsis of:

1. The physical evidence available;

2. Statements of officer(s) who were involved in or witnessed the incident;

3. Statements of known witnesses to the incident; and

4. The statement of the person against whom a response was directed or who has alleged a *Use of Force* incident against them.

5. The supervisor's conclusions based on the facts as submitted in their investigative summary.

    a. Conclusions as to what response was used by the officer(s), and whether allegations of a *Use of Force* incident in addition to that reported by the officers are true;

    b. Conclusions as to whether the response was justified by the circumstances (was the officer acting legally and appropriately when the incident began);

    c. Conclusions as to whether the response was excessive, or more than was necessary to overcome resistance;

    d. Conclusions as to whether the response was applied within the constraints of departmental policy and standards of training (authorized equipment utilized by the officer, officer properly trained and authorized to carry the equipment, etc.);

    e. Conclusions as to whether this incident indicates the need for general or specialized training for any of the officers involved;

    f. Conclusions as to whether disciplinary action is warranted against any of the officers involved in the incident. In the event disciplinary action is recommended, the officer's Performance History should be obtained from the Department Advocate along with the recommendation for appropriate discipline.

6. In cases where a person was only pepper sprayed or received minor injuries (i.e. small shallow cuts, scrapes, abrasions, etc.) as a result of their apprehension (i.e. pushed, wrestled, tripped, tackled or having a limb twisted.) **and** there are no allegations of an excessive response, supervisors will need to complete a brief *BlueTeam Internal Investigation Incident Report* detailing the events, ensuring that they have an interview of the suspect, witness information if any and a synopsis of the incident.

    • An investigating supervisor will seek witnesses and include their information and statements in the comments section of the addendum. Written witness statements will not be necessary unless the witnesses' statements do not corroborate the officer's statement about the apprehension/OC spray.

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**General Order 3.03-2**                                                  **Use of Force**



7. Any Disciplinary or Training issues should also be included with the investigation packet.

I. The completed Administrative Investigation, including all attached reports **(EXCEPT Officer Injury Reports)**, statements and photographs, are submitted via a *BlueTeam Internal Investigation Incident Report* entry to the originating Division Commander within 14 calendar days of the event. After review and approval, the reports are forwarded to the Professional Standards Bureau, which is the official repository for all such reports.

The Professional Standards Bureau will also maintain reports of Chemical Irritant usage and reports of TASER usage. The Professional Standards Bureau will report these usages as separate from other *Use of Force* incidents and note that the incident was a use of OC spray or a TASER usage.

## VI. USE OF NECK RESTRAINT

A. The use of a neck restraint is prohibited except where deadly force would be authorized and where necessary to protect an officer or member of the public from an imminent threat of death or serious physical harm.

B. This prohibition includes any incident where an individual attempts to ingest narcotics or other evidence. Any subject that ingests evidence will be taken immediately to the nearest hospital.

## VII. ANNUAL REPORTING

A. The Director and Chief of Police or designee will provide an Annual Use of Force report to the City Commission.

B. Sworn personnel will receive in-service training, at least annually, on the department's use of force policy.

This General Order supersedes all prior rules, regulations, policies and procedures, whether oral, written or by previous practice.

**3.03-2**
Page **15** of **15**
Rev. 05/25

STATEMENT OF PURPOSE

The primary purpose of this policy is to establish guidelines relative to the use of force and an officer's duties before, during and after the use of force. Sworn law enforcement officers have been granted the authority to use force when necessary to accomplish lawful ends. That authority is grounded in the responsibility of officers to comply with the laws of the State of Ohio regarding the use of force and to comply with the provisions of this policy. Equally important is law enforcement's obligation to prepare individual officers in the best way possible to exercise that authority.

In situations where law enforcement officers are justified in using force, the utmost restraint should be exercised. Use of force should never be considered routine. In exercising this authority, officers must respect the sanctity of all human life, act in all possible respects to preserve human life, and do everything possible to avoid unnecessary uses of force, and minimize the force that is used, while still protecting themselves and the public.

POLICY STATEMENT

It is the policy of the Dayton Police Department that officers hold the highest regard for the sanctity of human life and the inherent dignity, liberty, and worth of all individuals. Police officers are authorized to use only reasonable force when necessary to protect life, property and to maintain order. The responsible exercise of this authority is among the most critical aspects of law enforcement. Excessive or unjustified force in response to resistance/aggression/non compliance undermines community confidence in the department and its officers and will not be tolerated. Ultimately, it may subject the officer, the department and the city to criminal and/or civil liability.

It is the policy of this department to use only that force which is necessary, proportional to the level of resistance/aggression/noncompliance, and objectively reasonable based on the totality of the circumstances as outlined in the Supreme Court case of Graham v. Connor, 490 US 386. When safe and feasible to do so, officers shall take all reasonable measures to de-escalate an incident and reduce the likelihood or level of use of force.

Because of the impact that incidents involving the use of force have on the department and the community, it is important that all incidents be promptly and completely documented, and fairly and accurately investigated. Thorough documentation and investigation is necessary to protect the rights of the public, the officer, and the interests of the department and the city.

The Dayton Police Department recognizes that officers are often forced to make split-second decisions about the use of force in tense, uncertain and rapidly evolving situations. Every incident will be reviewed based on the totality of the circumstances known by the officer at the time and from the perspective of a reasonable officer, in the same or similar circumstances.

Any use of force that is not necessary, proportional, and objectively reasonable and does not reflect reasonable de-escalation efforts, when safe and feasible to do so, is prohibited and inconsistent with department policy.

I.   CORE PRINCIPLES

Sound judgment and the appropriate exercise of discretion will always be the foundation of police officer decision making in the broad range of possible use of force situations. It is not possible to entirely replace judgment and discretion with detailed policy provisions. Nonetheless, this policy is intended to ensure that de-escalation techniques are used whenever feasible, that force is only used when necessary, that the amount of force used is proportionate to the situation that an officer encounters, and that force is objectively reasonable based upon the standard described herein.

In addition to officer safety, the Department's core use of force principles are as follows:

A.  SANCTITY OF HUMAN LIFE

1. The Department's highest priority is the sanctity of human life. In all aspects of their conduct, Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved.

2. The Dayton Police Department seeks to gain the voluntary compliance of subjects, when consistent with personal safety, to eliminate the need to use force or reduce the force that is needed.

B.  PUBLIC COOPERATION

1. A strong partnership with the public is essential for effective law enforcement.

2. Inappropriate or excessive uses of force damage that partnership and diminish the public trust that is a cornerstone of policing in a free society.

3. Officers will act:

i.   with a high degree of ethics, professionalism, and respect for the public.

ii.  in a manner that promotes trust between the Department and the communities that it serves.

C.  USE OF FORCE: OBJECTIVELY REASONABLE, NECESSARY, AND PROPORTIONAL

1. OBJECTIVE REASONABLENESS STANDARD

i.   ALL FORCE MUST BE OBJECTIVELY REASONABLE.

ii.  Objectively reasonable Force is a level of force that is appropriate when analyzed from the perspective of a reasonable officer on scene, rather than with 20/20 hindsight. Objective reasonableness takes into account, where appropriate, the fact that officers must make rapid decisions regarding the amount of force to use in tense, uncertain, and rapidly evolving situations. All uses of

force are analyzed under the Fourth Amendment as guided by the United States Supreme Court. Graham v. Connor, 490 U.S. 386 (1989).

    iii. Officers shall assess each incident and determine based on law, policy, training, and experience, which level of force should be used to control the situation in the safest manner for all individuals involved. Reasonable and sound judgment will dictate the force option to be deployed.

    iv. The reasonableness inquiry with respect to force is an objective one, whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting and reasonably known to the officer at the time of the incident. These factors include, but are not limited to the following:

        1. the severity of the crime at issue;

        2. whether the subject is posing an imminent threat to the officer or others;

        3. whether the subject is actively resisting or attempting to evade arrest by flight;

        4. the subject's proximity or access to weapons.

2. NECESSITY

    i. OFFICERS SHOULD USE ONLY THE AMOUNT OF FORCE NECESSARY TO ACHIEVE A LAWFUL OBJECTIVE.

    ii. Officers should not exercise force unless it is necessary and as a last resort.

    iii. Officers should exhaust all other reasonable means before resorting to the use of force.

        1. Using force only as a last resort means that officers will not engage in unnecessary, overly aggressive, or otherwise improper actions that create a situation where force becomes needed.

        2. Using force only as a last resort also means that an officer shall not use force if a safe alternative would achieve the law enforcement objective.

    iv. Officers may use force only to accomplish specific law enforcement objectives to include:

        1. To overcome resistance directed at the officer or others;

        2. To prevent physical harm to the officer or to another person, including intervening in

a suicide or other attempt to self-inflict injury; or

3. To protect the officer, or a third party, from unlawful force.

3. PROPORTIONALITY

    i. ALL FORCE MUST BE PROPORTIONAL TO THE LEVEL OF THE SUBJECT'S RESISTANCE.

    ii. Officers will use only the force that is proportional to the threat, actions, and level of resistance offered by a subject. This may include using greater force or a different type of force than that used by the subject. The greater the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be necessary to overcome it. When or if the subject offers less resistance, however, the officer will decrease the amount or type of force accordingly. Force used by an officer shall proportionally decrease as the level of resistance by the subject decreases.

D. MEDICAL ATTENTION

1. Once the scene is safe and as soon as practical, whenever an individual is injured, complains of injury, or requests medical attention, officers will immediately request appropriate medical aid for the injured person and may provide appropriate medical care consistent with their training to any individual who has visible injuries, complains of being injured, or requests medical attention. This may include providing first aid and/or arranging for transportation to an emergency medical facility.

2. Officers will treat injured persons, whether another officer, a member of the public, or a subject, with dignity and respect.

E. DUTY TO INTERVENE AND REPORT

1. Any officer present and observing another officer engaging in an unauthorized use of force must, when in a position to do so safely, intervene to prevent the violation. Failure to do so may result in disciplinary action up to and including dismissal. Officers must promptly report any such violations to a supervisor.

F. USE OF FORCE-PROHIBITIONS

1. Officers may not use or threaten to use force for the following reasons:

    i. To resolve a situation more quickly, unless the extended delay would risk the safety of the person involved, officers, or others, or would significantly interfere with other legitimate law enforcement objectives;

    ii. To subdue a person who is not suspected of any criminal conduct, other than to protect that person's, an officer's or another person's safety;

    iii. To retaliate against a person (which includes, but is not limited to, force in excess of what is objectively reasonable to prevent an escape, force to punish individuals for fleeing or otherwise resisting arrest, force used to punish an

individual for disrespecting officers, and other such circumstances);

iv. To prevent a person from resisting or fleeing in the future;

v. Against persons who only verbally confront officers and are not involved in criminal conduct;

vi. Against persons who are handcuffed, and/or restrained and compliant, where their actions present no substantial risk of escape, injury, and/or property damage;

vii. Against persons engaged in the lawful exercise of First Amendment rights (e.g., protected speech, lawful demonstrations, observing or filming police activity, or criticizing an officer or the department);

viii. Based on bias against a person's race, ethnicity, nationality, religion, disability, sex, gender identity, sexual orientation, or any other protected characteristic.

Use a chokehold or any form of vascular neck restraint except where deadly force would be authorized and where necessary to protect an officer or member of the public from an imminent threat of death or serious physical harm. This prohibition includes any incident where an individual attempts to ingest narcotics or other evidence. Any subject that ingests evidence will be taken immediately to the nearest hospital